**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN PRICE, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     v.<br><br>MICHAEL STRIANESE and RALPH D'AMBROSIO,<br><br>              Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF**
**THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiff John Price ("Plaintiff"), by and through his attorneys, files this Complaint on behalf of himself and other similarly situated current and former employees of L-3 Communications Corporation ("L-3" or the "Company"), or its predecessor and affiliated companies, who were participants in and beneficiaries of the L-3 Communications Master Savings Plan (the "Plan") and who were invested in the L-3 Stock Fund during the period of January 30, 2014, through July 31, 2014, inclusive (the "Class Period"). He alleges the following based on the investigation of his counsel, which included a review of the Plan's governing documents (produced by L-3 in response to a Plan request) and annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor; discussions with Plan participants; other SEC filings by L-3; other lawsuits against L-3; press releases and other public statements issued by L-3; and media reports about L-3. Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

# I.  INTRODUCTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, by participants in the Plan, and on behalf of the Plan, against Michael Strianese and Ralph D'Ambrosio (collectively, "Defendants"), both members of L-3's Benefit Plan Committee (the "Committee"), which has been designated the Plan's fiduciary, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them.  The breaches of fiduciary duty arose out of a massive accounting fraud at L-3, ***which it has admitted***, that artificially inflated the value of its stock price, making it an imprudent investment.

2.      Defendants, who were specifically responsible for monitoring the prudence of the L-3 Stock Fund, breached their fiduciary duties to Plan participants, "the highest [duty] known to the law," when they learned that L-3 stock has become artificially inflated due to the Company's accounting fraud yet took no action whatsoever to protect the Plan or Plan participants from harm.  Defendants failed to take necessary action to stop purchases under the Plan of stock at inflated prices, or to issue immediate corrective disclosures of the fraud consistent with the federal securities laws, either of which action would have prevented further harm to Plan participants that their purchasing and holding of an imprudent investment would inevitably cause, or at the very least to purchase or finance a low-cost hedging product to offset future losses.

3.      L-3 supplies command-and-control, communications, intelligence, surveillance and reconnaissance systems and products, avionics, ocean products, training devices and services, instrumentation, space, and navigation products to the United States

Departments of Defense and Homeland Security, United States government intelligence agencies, NASA, aerospace contractors and commercial telecommunications and wireless customers.

4.      L-3 is headquartered at 600 Third Avenue, New York, New York.  As of April 23, 2014, L-3 had more than 86 million shares of common stock outstanding which actively traded throughout on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "LLL."

5.      During the Class Period, L-3 engaged in an accounting fraud which materially misrepresented its financial results.  L-3 has admitted and acknowledged that: i) misconduct, accounting errors and concealment occurred at its Aerospace Systems segment, responsible for 36% of its revenues; ii) four senior officers who participated in the accounting fraud were terminated for intentional misconduct; iii) its financial results on its annual report for 2013 and quarterly report for the first quarter of 2014 were misstated by $169 million, and L-3 belatedly filed corrected results; and iv) its internal controls for financial reporting ("ICFR") were inadequate and it adopted remediation plans that it still cannot state are effective.

6.      Indeed, according to two former employees of the Aerospace Systems' segment, a whistleblower reported the accounting fraud to L-3's corporate headquarters *before the financial misstatements occurred*.

7.      As a result of the fraud at L-3, its stock became artificially inflated during the Class Period.  When the fraud was first revealed, L-3's stock price fell by $15 per share, or 12%, in one day, and L-3's fraud has likely had a long-term damaging impact on the Company's reputation, causing the stock to trade at a lower price than it otherwise would

have had it refrained from engaging in corporate fraud, or at least if it had put an end to the fraud earlier than it did.

8.      The Plan is a defined contribution plan sponsored by L-3 for eligible employees.  Among the investment options available to Plan participants is the L-3 Stock Fund, which invests primarily in shares of L-3 stock and remains one of the largest holdings under the Plan.

9.      Defendants were among the primary fiduciaries of the Plan.  One of their most important duties was ensuring that the Plan's investment options, including the L-3 Stock Fund, remained suitable and prudent for retirement investing.  Notwithstanding any other language in the Plan, or policy or delegation which attempted to remove decision-making responsibility or discretion, Defendants were obligated under the law to ensure that investment of employee retirement funds in the L-3 Stock Fund remained a prudent investment option.  This responsibility to ensure the prudence of the L-3 Stock Fund cannot be delegated, abnegated or otherwise avoided.

10.     Defendants knew or should have known that the L-3 Stock Fund had become imprudent during the Class Period.  They knew that the Company's financial results were materially misstated, and that there was accounting fraud within its Aerospace Systems segment; indeed, they were directly responsible for many of those material misstatements.  Defendants also knew that L-3's internal controls had material weaknesses, and that these had caused its false and misleading financial reporting.  As a result, Defendants knew that the Company's stock price was artificially inflated in value, and that inevitable harm would result when the truth was revealed.

4

11.     As the Plan's fiduciaries, Defendants were empowered by the Plan's governing documents and ERISA to close the L-3 Stock Fund to new purchases, issue new investment guidelines or otherwise prevent Plan participants from purchasing the L-3 Stock Fund at artificially inflated prices, at least until the stock price was corrected.

12.     Defendants, not only as fiduciaries but as senior executives and Sarbanes-Oxley signatories with reporting responsibilities under the federal securities laws, also could have issued truthful or corrective disclosures to cure the fraud and make L-3's stock a prudent investment again. Defendants had a duty to communicate material information to Plan participants under ERISA and a duty to correct false and misleading public statements under the federal securities laws.  Defendants should have taken action to ensure that L-3's stock price traded at, or was returned to, its true, uninflated value.  Defendants' failure to adhere to their duties resulted in their knowing or reckless concealment of fraud, and the imprudence of L-3 stock, from Plan participants.

13.     Defendants could not have reasonably believed that restricting new purchases of the L-3 Stock Fund would likely do more harm than good to the Plan or Plan participants.   Simply preventing new purchases would not have constituted "insider trading" under the federal securities laws because restricting purchases at inflated prices would not constitute a transaction or convey any insider benefit.  As long as Defendants made sure to restrict sales at the same time that they restricted purchases, their actions would have been permissible under the securities laws.

14.     In contrast, Plan participants suffered serious and concrete financial harm by overpaying for stock that was fraudulently inflated in price when they had other available investment options.  No matter what happened to the stock price in the future, the

5

Plan participants who purchased L-3 Stock Fund shares during the Class Period were damaged because they suffered unnecessary losses when the artificial inflation was corrected, and they stand to miss out on future profits even as the stock price has finally recovered its losses because of the artificially high price they originally paid for their investment.

15.     Additionally, Defendants also could not have reasonably believed that effectuating truthful, corrective disclosure would do more harm than good to the Plan or Plan participants. First and foremost, defrauding Plan participants runs counter to the fundamental obligation under ERISA to be truthful and accurate in communicating with those to whom one's fiduciary duty is owed.  Defendants knew that Plan participants were buying and holding L-3 Stock Fund shares whose value was artificially inflated through fraud.  At a minimum, Defendants had the fiduciary obligation to disclose the truth to correct the fraud.

16.     Defendants also knew (or should have known) that  L-3 stock traded in an efficient market.  As experienced senior executives, Defendants were—or should have been—familiar with the rudimentary principles of how securities trade in efficient markets. Thus, they would have known that correcting the Company's fraud would reduce L-3's stock price only by the amount by which it was artificially inflated to begin with.  They had no basis to believe that any factor was distorting the market for L-3 stock at the time— such as widespread short-selling or liquidity problems or the like—and thus no reason to fear that public correction of the Company's fraud would reduce L-3's stock price to anything but its true, accurate value.

17.    Moreover, Defendants knew or should have known that, the longer a fraud of a public company like L-3 persists, the harsher the correction is likely to be when that fraud is finally revealed.  Empirical research by economists has shown that when a public company like L-3 prolongs a fraud, the price correction when the truth emerges is that much harsher, because not only does the price have to be reduced by the amount of artificial inflation, but it is reduced by the damage to the company's overall reputation for trustworthiness as well.  Some experts estimate that reputational damage can account for as much as 60% of the price drop that occurs when a fraud is revealed.  This figure, unsurprisingly, usually increases over time.  So, the earlier a fraud is corrected, the less reputational damage a company is likely to suffer.

18.    Such a consideration should have been in the forefront of Defendants' minds when they learned that L-3's stock price was artificially inflated by fraud.  The sooner they corrected that fraud, the less reputational damage the Company would suffer, and therefore the gentler the price correction would be.  And in the long term, the Company's reputational trustworthiness would have been less undermined as well, making a swifter price recovery, and greater future gains, more likely.  If Defendants were really concerned about doing more harm than good to the Plan and Plan participants, then they should have sought to minimize the harm that correcting the fraud would temporarily cause, which effectively means disclosing the truth sooner rather than later.

19.    As a last resort, Defendants could have used their authority as fiduciaries to divert some of the Plan's funds into, or otherwise purchase or finance, a low-cost hedging product that would behave in a countercyclical fashion *vis-à-vis* L-3 stock.  Such products have been available to providers of ESOPs for many years now and can be funded through

a variety of means, including by using the Plan's liquid assets, using cash provided by the Plan Sponsor, or through the Plan's using secure financing to purchase such a product. These hedging products impose very few transaction costs on a retirement plan, and their proprietary hedging formula allows for an ERISA fiduciary to make at least a contingency plan to deal with the inevitable drop in stock price that will come from the perpetuation of a corporate fraud. And, because such hedging products are not derivatives, an ESOP's purchase of them does not qualify as a disclosable event under the federal securities laws. Defendants' failure to put into action such a hedge strategy therefore resulted in specific financial damage to the Plan, which, upon information and belief, can be quantified with access to necessary fact discovery and through the use of expert analysis.

20.    Moreover, Defendants should have recognized that L-3's fraud was inevitably going to be revealed whether they paid attention to their fiduciary duties under ERISA or not. For a variety of reasons, this was not the kind of fraud that Defendants could simply "wait out" and hope would dissipate on its own; disclosure of the truth about L-3's fraudulent accounting, and, therefore, a concomitant stock price correction, was inexorable.

21.    This is so, first of all, because Defendants were also obligated under the federal securities laws to correct the fraud. As the senior-most employees at the Company, and as the two people with the greatest responsibility for making L-3's disclosures under the securities laws, Defendants knew better than anyone that, eventually, they would have to comply with their duties under the securities laws, thus making disclosure of the truth inevitable.

22. Second, L-3 was under multiple investigations by government regulators, including the SEC and the United States Department of Justice ("DOJ"); Defendants knew what those investigations were going to uncover, which means that they also knew what would happen when those regulators concluded their investigations—public disclosure of L-3's wrongdoing.

23. Indeed, common sense should have told Defendants that most corporate frauds do not persist indefinitely without eventually being revealed. Thus, they should have recognized that the price correction to L-3's stock that revelation of the truth would cause—in other words, the "harm" of a stock price drop—was going to happen no matter what, and they should consequently have sought to effectuate that correction sooner rather than later to mitigate the harm done to Plan participants (not to mention investors generally).

24. Defendants also should have recognized that disclosure of the Company's fraud by its own officers would likely result in a less harsh correction than if disclosure occurred because of a government investigation or a media report fed by whistleblowers—and that the Company's treatment at the hands of those regulators would likely be gentler if the Company voluntarily admitted its wrongdoing prior to its being exposed by some other means.

25. The greater harm caused by Defendants' inaction is not merely theoretical. Upon information and belief, the Plan purchased approximately $30 million dollars' worth of L-3 stock during the Class Period from employee contributions. The longer L-3's fraud went on, the more purchasers bought at artificially inflated prices; and because the artificial inflation increased during most of the Class Period, the size of the harm to each purchaser

9

increased over time as well, because the stock had that much farther to fall when the truth inevitably came out.  Even the holders of L-3 shares were hurt in this manner; by holding shares over a period of time when L-3 stock was artificially appreciating in value, they were deprived the option of transferring their shares into a different, prudent investment and thus sparing themselves greater losses when the correction ultimately took place.  They also suffered a harsher price correction when L-3's fraud was belatedly revealed to the public.

26.    In fact, earlier disclosure by Defendants would have not merely have mitigated the harm to the Plan and Plan participants, but it would have affirmatively benefitted them as well. With the truth about L-3's accounting, Plan participants could properly evaluate the L-3 Stock Fund versus their other investment alternatives for their retirement savings.   Plan participants considering new purchases with their annual contributions could select healthier, prudent investment options such as diversified mutual funds which outperformed L-3 stock during the Class Period.   And over the long term, Defendants' failures to act as Plan fiduciary to expose corporate fraud is likely to have a chilling effect on future purchases of the L-3 Stock Fund by Plan participants, whose trust in their employer is inevitably eroded by this malfeasance.  Such an effect constitutes a net harm to the Plan.

27.    But Defendants did not take any of these steps.  Instead, they breached their fiduciary duties to the Plan and Plan participants.  Defendants knew of the accounting fraud at the Aerospace Systems segment, that the Company's financial results were false and misleading, and that its stock price was artificially inflated and imprudent.  Yet, Defendants failed to restrict new purchases of the L-3 Stock Fund by the Plan or make corrective

disclosures so that its Plan participants were harmed by overpaying for imprudent stock at artificially inflated prices, and were denied the opportunity to make informed alternative investments. Defendants further failed to divert some of the Plan's funds, or otherwise purchase or finance, a low-cost hedging product that would off-set the inevitable harm to Plan participants caused by L-3's fraud.

28.     While Defendants did nothing, L-3's stock price traded up to over $130 per share, then fell to $105 per share, costing its employees many millions of dollars in retirement savings. Meanwhile, on January 11, 2017, L-3 was fined $1.6 million by the SEC for the very same accounting fraud that underlies this action, and L-3 remains the subject of an ongoing DOJ investigation, causing further damage to the credibility of L-3 and the Plan. Defendants, as Plan fiduciaries, are directly responsible for this enormous harm to the Plan and Plan participants that their breach of duty has caused.

## II.     JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

30.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and L-3 and maintains its primary place of business in this district.

## III.     THE PARTIES

31.     Plaintiff John Price is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). He is a former employee of L-3 who was and continues to be a

participant in the Plan.  He purchased and held shares of L-3 stock through the L-3 Stock

Fund in his Plan retirement savings account during the Class Period.

32.     Defendant Michael Strianese was the Chief Executive Officer ("CEO") of

L-3 during the Class Period as well as a member of the Committee, which is a named

fiduciary of the Plan.  Defendant Strianese was also a fiduciary of the Plan pursuant to

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because, as a member of the Committee, he

had discretionary authority and control regarding the management of the Plan and the

Plan's assets.

33.     Defendant Ralph D'Ambrosio was the Chief Financial Officer ("CFO") of

L-3 during the Class Period as well as a member of the Committee, which is a named

fiduciary of the Plan.  Defendant D'Ambrosio was also a fiduciary of the Plan pursuant to

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because, as a member of the Committee, he

had discretionary authority and control regarding the management of the Plan and the

Plan's assets.

## IV.    THE COMMITTEE IS THE PLAN'S "NAMED FIDUCIARY"

34.     The Plan is a defined contribution benefit plan that is sponsored by L-3 for

eligible employees and is subject to ERISA.  Employees can elect to defer up to 25% of

their compensation into the Plan, and L-3 will make an automatic contribution for some

employees (subject to certain restrictions).  The Plan participants' contributions are made

in cash, while L-3 makes its employer's contribution in L-3 stock.

35.     The Plan is governed by the August 1, 2013 Plan document which provides,

in Section 2.3 General Provisions, "(f) For purposes of ERISA, the Company shall be the

12

'*Named Fiduciary*' and the '*Plan Administrator*' and is hereby designated as agent for service of legal process for the Plan."

36.     Plan participants may, under the Plan, elect to direct their investments into any of the investment options.  The Plan's investment options include the L-3 Stock Fund, which invests primarily in L-3 stock, as well as a variety of stock and bond mutual funds including numerous target date funds of various maturities.  These mutual funds provided the Plan participants with alternative investments which diversified their retirement savings and tracked the broad securities markets.

37.     According to the 2014 Summary Plan Document issued by the Company to Plan participants, oversight and administration of Plan investments, including the L-3 Stock Fund, is delegated by the Company to the Committee, which has "sole, complete and final discretionary authority to make all determinations regarding an employee's participation, contributions and benefits."  The Committee is responsible for "select[ing] the investment options available under" the Plan and, at its discretion, can "establish or discontinue any investment option at any time."  The Committee was made up of Defendants as well as four other individuals during the Class Period.[1]

38.     Thus, if investment in the L-3 Stock Fund contravenes applicable law—like if it becomes imprudent under ERISA—the Committee is empowered to take necessary action, including temporarily ceasing to offer the L-3 Stock Fund until such time as it became a prudent investment again.

---

[1]     At this time, Plaintiff does not allege that these four other members of the Committee had knowledge of the Company's fraud, and, therefore, of the artificial inflation of L-3's stock price and the concomitant imprudence of the L-3 Stock Fund as a retirement investment.

39.    During the Class Period, the Plan held substantial holdings of the L-3 Stock Fund.    As of December 31, 2013, just one month before the Class Period began, Plan participants held $909 million of the L-3 Stock Fund, and it was the largest single investment held by the Plan.    Thus, Defendants knew or should have known that any fraud that impacted L-3's stock as an investment would also have a serious impact on the Plan and the Plan participants.

40.    Based on these Plan and Plan-related provisions, throughout the Class Period, Defendants had the power and authority to take action to restrict offering the L-3 Stock Fund under the Plan, if necessary, to achieve compliance with ERISA, to correct any breaches of fiduciary duty toward Plan participants, or to act in the "best interests" of the Plan or the Plan participants.    Defendants had the authority to close the L-3 Stock Fund to new investments while the Company's stock price remained artificially inflated and therefore imprudent.    And, of course, Defendants could have simply made corrective disclosures to the public as a whole, thereby fulfilling their fiduciary duties to Plan participants.

## V.    L-3's ACCOUNTING FRAUD ADMISSIONS

41.    L-3 was founded in 1997 and built through mergers and acquisitions of smaller companies. It supplies a wide range of military and civil electronics equipment and services, including aircraft "black boxes," communications transponders and cockpit display panels.    L-3 is one of the top ten U.S. government contractors, with two of its largest customers being the U.S. Departments of Defense and Homeland Security.

42.    L-3 operates via four reportable segments, with each segment's corresponding portion of total net sales in parentheses: (1) Aerospace Systems (36%); (2)

Electronic Systems (36%); (3) Communication Systems (18%); and (4) National Security Solutions (10%). The Aerospace Systems segment focuses on communications and information-gathering systems and products for aircraft and other vehicles.

43.     During the Class Period, L-3 engaged in an accounting fraud that materially misrepresented its financial results. L-3 has admitted and acknowledged that: i) misconduct, accounting errors and concealment occurred at its Aerospace Systems segment, responsible for 36% of its revenues; ii) four senior officers who participated in the accounting fraud were terminated for intentional misconduct; iii) its financial results on its annual report for 2013 and quarterly report for the first quarter of 2014 were misstated by $169 million, and L-3 subsequently filed corrected results; and iv) its ICFR were inadequate and it adopted remediation plans that it still cannot state are effective.

44.     Because of this accounting fraud at L-3, its stock was imprudent under ERISA during the Class Period.

**A. On July 31, 2014, L-3 First Reports Misconduct, Accounting Errors and Concealment in Its Aerospace Systems Unit**

45.     On July 31, 2014, before the opening of trading on that day, L-3 issued a press release (the "July 2014 press release") announcing its second quarter 2014 financial results that it said were "preliminary because the Company is currently conducting an internal review that could result in increases to the preliminary adjustments included in this release."

46.     The July 2014 press release further stated, in pertinent part, as follows:

The review relates to accounting matters at the Company's Aerospace Systems segment, and is being conducted with the assistance of outside accounting and legal advisors. The Company currently expects to incur an aggregate pre-tax charge of $84 million against operating income and a related reduction in net sales of approximately $43 million. Of these charges, approximately $50 million

relates to periods prior to 2014, and approximately $34 million relates to the first half of 2014, of which $30 million relates to the second quarter of 2014. Additionally, as a result of the review, the Company has lowered its estimated operating income for the Aerospace Systems segment by approximately $35 million for the second half of 2014.

*The adjustments primarily relate to contract cost overruns that were inappropriately deferred and overstatements of net sales, in each case with respect to a fixed-price maintenance and logistics support contract.* The period of performance on this contract began December 1, 2010, and is scheduled to end on January 31, 2015. *The Company believes that the amounts associated with these adjustments are the result of misconduct and accounting errors at the Aerospace Systems segment. The misconduct included concealment from L-3's Corporate staff and external auditors.*

\* \* \*

*"We are extremely disappointed that our established policies, code of ethical conduct and controls were violated in this instance[,]"* said Michael T. Strianese, chairman, president and chief executive officer.

47.    During a call held that day with analysts and investors, Defendant and CEO Strianese discussed details of L-3's internal review, including the disclosure that four employees were terminated as a result of the misconduct.  Strianese stated, in pertinent part, as follows:

*Through our internal processes we became aware of the misconduct.  We initiated a review and identified overstatements of net sales and contract cost overruns that were inappropriately deferred.  The misconduct included concealment from L-3's corporate staff and external auditors. As part of our review, we are examining the financial records of the entire Aerospace Systems segment. The adjustments arising from the review include a charge of $34 million related to the first half of 2014, of which $30 million relates to the second quarter.* We are extremely disappointed by this matter. While the review remains ongoing, *we have taken remedial actions including the termination of four employees.  A fifth employee has resigned.* Based on the ongoing review and the findings, we will take additional remedial actions as necessary…. It is worth reiterating that based on what we know at this time, these accounting issues are primarily limited to one business unit in the Aerospace Systems segment. We have no reason to believe that this issue occurred at any other segments of the Company.

16

48.    In response to a question from Ron Epstein, BofA Merrill Lynch analyst, Strianese identified that the misconduct was the result of "bad actors" who were terminated:

Again, Ron, the investment – the inquiry is ongoing. The corporate review is ongoing and we have outside experts engaged, including some very high-power resources in the field. ***But the people involved have been fired. They are gone. So that gives me a lot of confidence that that was the failure point because we have some bad actors and they are no longer part of L-3***. And that is my answer.

49.    Defendant and CFO D'Ambrosio quantified the details concerning L-3's internal review and its impact on the Company's financial results, including preliminary pretax charges against operating income totaling $84 million. D'Ambrosio stated, in pertinent part, as follows:

As Mike mentioned earlier, we are conducting an internal review relating to misconduct and related accounting matters at the Aerospace Systems segment. They primarily relate to one contract in the segment's logistics solutions sector for which sales and profit were overstated and cost overruns were inappropriately deferred.
* * *
***Based on the findings and the results of the internal review to date, we recorded preliminary pretax charges against operating income totaling $84 million. Those charges pertain to periods from 2011 through the first half of 2014***. Specifically, $30 million is for the second quarter of 2014 and $34 million is for the first half of 2014.  For 2013 the charge is $34 million, $13 million for 2012, and $3 million for 2011.  Additionally, with respect to 2013, $5 million of charges affected the second quarter and $11 million affected the first half. We also recorded preliminary adjustments to reduce sales by $43 million in the aggregate with $15 million for the second quarter of 2014, $17 million for the first half of 2014, $25 million for 2013, and $1 million for 2011.

***We are reporting these financial statement adjustments that pertain to periods before the second quarter of 2014 by revising our previously issued financial statements for those periods***. Our 2014 second-quarter preliminary earnings release includes tables that provides additional details for these financial statement revisions. As I said a few moments ago, the adjustments primarily pertain to one fixed-price maintenance and logistics support contract for the US Department of Defense. We began working on that contract on December 1, 2010, and our period of performance ends on January 31, 2015.  That contract has

averaged annual sales of approximately $150 million. It has been a low-margin contract and, with these adjustments, it is now in a loss position.

* * *

***Getting back to this internal review at Aerospace Systems segment, I must tell you that we are terribly disappointed by the misconduct at that segment and I am outraged by it. There is nothing more important to me than the integrity of our financial statements. They are the absolute bedrock and we are taking all the necessary remedial actions.***

50.    As disclosed by *Reuters* that evening, the announcement had come about as the result of an "employee complaint" and had already resulted in four employees being fired and one more resigning.  The same day, *The Wall Street Journal* also reported that L-3 had "learned from a whistleblower that a group of former employees misstated revenue and costs linked to a U.S. Army contract." L-3 did not disclose that day when the whistleblower came forward, but the Company had already hired the law firm Simpson Thacher to conduct an investigation and the consulting firm AlixPartners to perform forensic accounting.

51.    *Reuters* further disclosed that "[t]he pretax charge include[d] adjustments for accounting errors L-3 found as it scrubbed its books during the review," citing confidential sources, who spoke on condition that they not be named. *Reuters* continued, stating that, ***"[t]he profit L-3 expected in the contract just wasn't there,"*** citing "one of the sources."

52.    As *Reuters* emphasized in its report:

L-3's shares plunged as much as 17 percent - their biggest intraday percentage drop ever - after the company said on Thursday it would take a pretax charge of $84 million for misconduct and accounting errors, including cost overruns and overstated sales figures from 2013 and 2014.

***The surprise announcement prompted some analysts to cut ratings on the company, and raised concern about a broader problem at L-3, which also suffered an ethics scandal in 2010***.

53.     On this news, the price of L-3's stock plummeted to close at $103.83 per share, down approximately $15 per share, or 12%, from its close the prior day, on very unusually high trading volume of more than 5.4 million shares trading.

**B.  On September 26, 2014, L-3 Issues an Update on Its Internal Review and Discloses Material Weaknesses**

54.     On September 26, 2014, L-3 filed a Form 8-K disclosing to the market the market on the status of its internal review of the Aerospace Systems segment.  This disclosure release confirmed analysts' fears, expressed on the July 31 conference call, that the internal review would reveal financial misstatements in more than just the Logistics Solutions sector of the Aerospace Systems segment. Indeed, L-3's internal review revealed that internal review adjustments for accounting misstatements impacted the Platform Systems sector as well. L-3 stated, in pertinent part, as follows:

> The Company continues to expect to revise its previously issued financial statements for the years ended December 31, 2013, 2012 and 2011 and the three months ended March 28, 2014, which will, along with the financial statements for the three and six months ended June 27, 2014, include the internal review adjustments in the appropriate periods. . . . ***Consequently, the Company currently expects to incur pretax income charges of approximately: (i) $51 million of a reduction to operating income for the three months ended June 27, 2014 for the internal review, including a reduction in net sales of $3 million, (ii) $12 million of a reduction to operating income for the three months ended March 28, 2014 for the internal review, including a reduction in net sales of $2 million, and (iii) $73 million of a reduction to pre-tax income for periods prior to 2014, comprised of $101 million of reductions to operating income for the internal review, including a reduction in net sales of $48 million, offset by $28 million primarily for interest income related to the sales-type lease transaction.***
>
> ***The internal review adjustments impact the Logistics Solutions and Platform Systems sectors of the Aerospace Systems segment. The aggregate adjustments attributable to the Logistics Solutions sector are approximately $117 million due to: (i) losses of $69 million, including inappropriately deferred cost overruns and $32 million of overstated net sales on the U.S. Army C-12 aircraft fixed-price maintenance and logistics support contract at the Army Sustainment division, and (ii) accounting errors of $48 million, including $5 million of overstated net sales, in connection with the valuation of inventories and***

*unbilled contract receivables on other logistics support contracts. The aggregate adjustments attributable to the Platform Systems sector are approximately $47 million, including overstated net sales of $16 million, primarily due to (i) losses on two aircraft modification contracts and two contracts for rotary wing sub-assemblies and parts, and (ii) write-offs of pre-contract costs to design, test and supply aerostructures for a new commercial aircraft*.

55.    In the September 26 Form 8-K, L-3 announced that it has lowered its Preliminary 2014 Financial Guidance provided on July 31, 2014, by lowering "its estimated operating income for the second half of 2014 for the Aerospace Systems segment by an additional $34 million, primarily due to expected lower profitability of $24 million for the Logistics Solution sector and Platform Systems sector, and additional expenses for the internal review of approximately $10 million."

56.    L-3 also revealed that the Company identified certain material weaknesses in its internal controls over financial reporting that existed as of December 31, 2013 and March 28, 2014, relating to the findings from the ongoing internal review of the Aerospace Systems segment.  L-3 stated, in pertinent part, as follows:

On February 25, 2014, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2013 (the "10-K") and concluded that, as of December 31, 2013, its disclosure controls and procedures ("DC&P") were effective at a reasonable assurance level. In addition, the Company disclosed in the 10-K its conclusion that its internal controls over financial reporting ("ICFR") were effective. On May 1, 2014, when our Quarterly Report on Form 10-Q for the quarter ended March 28, 2014 was filed, the Company's management also concluded that its DC&P were effective at a reasonable assurance level at March 28, 2014. *Subsequent to the filing of our Quarterly Report on Form 10-Q for the quarter ended March 28, 2014, the Company identified certain material weaknesses in its internal control over financial reporting that existed as of December 31, 2013 and March 28, 2014, relating to the findings from the ongoing internal review of the Aerospace Systems segment*. Solely as a result of these material weaknesses, the Company has concluded that its DC&P were not effective as of December 31, 2013 and March 28, 2014, and that its ICFR were not effective as of December 31, 2013. Accordingly, in addition to the revisions of financial statements (discussed above), the Company will amend its Annual Report on Form 10-K for the year ended December 31, 2013, and its Quarterly Report on Form 10-Q for the quarter ended March 28, 2014, to revise its conclusions and disclose that *management's*

*current conclusion is that the Company's ICFR was not effective as of December 31, 2013, and its DC&P was not effective at December 31, 2013 and March 28, 2014.*

57.    Significantly, in identifying its material weaknesses, L-3 referenced "intentional override of numerous transaction and monitoring internal controls."  L-3 stated, in pertinent part, as follows:

> *The Company's management has currently identified the following material weaknesses in its ICFR.*
>
> 1.    *The Aerospace Systems segment failed to maintain an effective control environment, including (i) inadequate execution of existing controls around the annual review and approval of contract (revenue arrangement) estimates, and (ii) not following established policies and procedures and intentional override of numerous transactional and monitoring internal controls related to its Army Sustainment division.*
>
> 2.    *The Company's procedures relating to the review of employee concerns regarding violations of the Company's accounting policies and internal controls over financial reporting by Aerospace Systems segment management were not executed in a manner that effectively resolved such concerns on a timely basis.*

The Company is strengthening its control environment and organizational structure by taking the following actions:

- The Company has replaced four members of senior management at the Company's Aerospace Systems segment, Logistics Solutions sector and Army Sustainment division, including the replacement of the Aerospace Systems segment chief financial officer, the Logistics Solutions sector president, and the Army Sustainment division president and vice president of finance.

- The Company has enhanced and reinforced its quarterly and annual financial statement certification process for the Company's Aerospace Systems segment and its divisions.

The Company also currently anticipates improving its policies and procedures by:

- conducting re-training sessions for its financial management at the Aerospace Systems segment and its divisions with regard to the Company's accounting policies and ICFR for (i) valuation of inventories, unbilled contract receivables and billed receivables; (ii) the preparation of contract

invoices; (iii) the preparation, review and approval of contract estimates; (iv) the recognition of incurred costs on fixed-price service contracts; (v) review and analysis of division quarterly financial statements; (vi) physical counts of inventory; and (vii) preparation, review and approval of journal entries. This training will be conducted by senior corporate financial management;

- expanding the testing of the compliance with the Company's ICFR by the Aerospace Systems segment and its divisions; and

- strengthening the Company's procedures for the review of employee concerns regarding violations of the Company's accounting policies and ICFR by designating one or more senior employees that will be responsible for ensuring that such concerns are reviewed in an effective manner, including by (i) when appropriate, assigning these matters to subject matter experts for review and resolution, and (ii) informing the appropriate members of senior management and the audit committee on a timely basis about the nature of the employee concerns and the scope and results of such reviews. These senior employees will report to the Company's chief executive officer and the audit committee with respect to such employee concerns.

58.    In short, L-3's disclosures admit that its prior ICFR were inadequate and misrepresented in its financial reports, and that "intentional overrides" were the cause of the misconduct at L-3.

### C. On October 10, 2014, L-3 Restates Its 2013 Yearly and First Quarter 2014 Financial Results

59.    On October 10, 2014, L-3 issued a press release announcing the completion of its internal review of the Aerospace System segment and disclosing the extent to which the intentional misconduct and materially weak internal controls harmed the Company. L-3 stated, in pertinent part, as follows:

> ***The Company recorded aggregate pre-tax income charges related to the Internal Review of approximately $169 million, including a reduction in net sales of $58 million. The periods impacted are as follows: (i) $55 million for the three months ended June 27, 2014, including a reduction in net sales of $7 million, (ii) $20 million for the three months ended March 28, 2014, including a reduction in net sales of $8 million, and (iii) $94 million for periods prior to 2014, including a reduction in net sales of $43 million.*** The adjustments related

to the Internal Review only affected the Logistics Solutions and Platform Systems sectors of the Aerospace Systems segment. The Internal Review adjustments attributable to the Logistics Solutions sector are approximately $117 million, including overstated net sales of $37 million, due to: (i) losses of $69 million, including inappropriately deferred cost overruns and $32 million of overstated net sales on a fixed-price Army maintenance and logistics support contract, and (ii) accounting errors of $48 million, including $5 million of overstated net sales, in connection with the valuation of inventories and unbilled contract receivables on other logistics support contracts. The Internal Review adjustments attributable to the Platform Systems sector are approximately $52 million, including overstated net sales of $21 million, primarily due to (i) losses of $37 million on two aircraft modification contracts and two contracts for rotary wing sub-assemblies and parts, and (ii) write-offs of deferred costs of $15 million to design and test aerostructures for a new commercial aircraft.

60.    On the same day, L-3 also restated its financial results for the quarter ended March 31, 2014 by filing Form 10-Q/A (Amendment No. 1), and for the year ended December 31, 2013 by filing Form 10-K/A (amendment No. 1).   In the Explanatory Notes of these amended filings, L-3 disclosed, as follows:

The Company continues to expect to revise its previously issued financial statements for the years ended December 31, 2013, 2012 and 2011 and the three months ended March 28, 2014, which will, along with the financial statements for the three and six months ended June 27, 2014, include the internal review adjustments in the appropriate periods…. ***Consequently, the Company currently expects to incur pretax income charges of approximately: (i) $51 million of a reduction to operating income for the three months ended June 27, 2014 for the internal review, including a reduction in net sales of $3 million, (ii) $12 million of a reduction to operating income for the three months ended March 28, 2014 for the internal review, including a reduction in net sales of $2 million, and (iii) $73 million of a reduction to pre-tax income for periods prior to 2014, comprised of $101 million of reductions to operating income for the internal review, including a reduction in net sales of $48 million, offset by $28 million primarily for interest income related to the sales-type lease transaction.***

***The internal review adjustments impact the Logistics Solutions and Platform Systems sectors of the Aerospace Systems segment.  The aggregate adjustments attributable to the Logistics Solutions sector are approximately $117 million due to: (i) losses of $69 million, including inappropriately deferred cost overruns and $32 million of overstated net sales on the U.S. Army C-12 aircraft fixed-price maintenance and logistics support contract at the Army Sustainment division, and (ii) accounting errors of $48 million, including $5 million of overstated net sales, in connection with the valuation of inventories and unbilled contract***

*receivables on other logistics support contracts. The aggregate adjustments attributable to the Platform Systems sector are approximately $47 million, including overstated net sales of $16 million, primarily due to (i) losses on two aircraft modification contracts and two contracts for rotary wing sub-assemblies and parts, and (ii) write-offs of pre-contract costs to design, test and supply aerostructures for a new commercial aircraft.*

61.    L-3 also revealed in its revised Form 10-K/A and Form 10-Q/A that the Company had identified certain material weaknesses in its internal control over financial reporting ("ICFR") that existed as of December 31, 2013 and March 28, 2014, relating to the findings from the ongoing internal review of the Aerospace Systems segment.

62.    L-3 disclosed in its amended filings as follows:

**Description of Material Weaknesses**

A material weakness is a deficiency, or a combination of deficiencies, in ICFR, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. Based on our assessment following the completion of the internal review of the Aerospace Systems segment discussed in Note 3, on page F-15, management has identified the following material weaknesses in its ICFR as of December 31, 2013.

1.    The Company did not maintain an effective control environment at its Aerospace Systems segment with respect to: (a) inadequate execution of existing controls around the annual review and approval of contract (revenue arrangement) estimates, (b) not following established Company accounting policies, controls and procedures, and (c) intentional override of numerous transactional and monitoring internal controls at its Army Sustainment division, with regard to the: (i) valuation of inventories, unbilled contract receivables and billed receivables; (ii) preparation of contract invoices; (iii) preparation, review and approval of contract estimates; (iv) recognition of costs overruns on a fixed-price maintenance and logistics support contract; (v) review and analysis of division quarterly financial statements; (vi) physical counts of inventory; and (vii) preparation, review and approval of journal entries.

2.    Company personnel did not perform reviews of certain employee concerns regarding violations of the Company's accounting policies and ICFR in a sufficient and effective manner, including assigning those matters to the appropriate subject matter experts for resolution, and informing appropriate members of senior management and the audit committee about the nature of the concerns and the scope and results of the reviews.

These material weaknesses resulted in immaterial adjustments of the Company's billed receivables, unbilled contract receivables, inventories, net sales, cost of sales, income tax expense and net income accounts, as well as earnings per share and related financial statements disclosures. Accordingly, the material weaknesses did not result in any material misstatements of the Company's financial statements and disclosures for the years ended December 31, 2013, 2012, or 2011. However, these material weaknesses, if not remediated, could result in material misstatements to the Company's annual financial statements or to the interim consolidated financial statements and related disclosures that would not be prevented or detected.

63.    Thus, in addition to the inaccuracies of its financial results, L-3's prior disclosures in its original Form 10-K and Form 10-Q filings, which stated that its internal controls were effective, were false and inaccurate.

64.    L-3 further disclosed in its Form 10-K/A filing that it was adopting the following remediation plans:

**Remediation Plans for Material Weaknesses in Internal Control over Financial Reporting**

In response to these identified material weaknesses, our management, with oversight from our audit committee, is dedicating significant resources to improve our ICFR and to address the identified material weaknesses. These efforts are ongoing and are focused on strengthening the Company's control environment and organizational structure by taking the following actions:

- The Company has terminated four employees at its Aerospace Systems segment and one employee at its Aerospace Systems segment resigned. The Company replaced its Aerospace Systems segment chief financial officer, the Logistics Solutions sector president, the Logistics Solutions sector general counsel, the Army Sustainment division president and the Army Sustainment Division vice president of finance at the time of the misconduct.

- The Company has enhanced and reinforced its quarterly and annual financial statement certification process for the Company's Aerospace Systems segment and its divisions.

The Company will also improve its policies and procedures by:

- conducting re-training sessions for its financial management at the Aerospace Systems segment and its divisions with regard to the Company's

accounting policies and ICFR for (i) valuation of inventories, unbilled contract receivables and billed receivables; (ii) the preparation of contract invoices; (iii) the preparation, review and approval of contract estimates; (iv) the recognition of incurred costs on fixed-price service contracts; (v) review and analysis of division quarterly financial statements; (vi) physical counts of inventory; and (vii) preparation, review and approval of journal entries. This training will be conducted by senior corporate financial management;

- expanding the testing of the compliance with the Company's ICFR by the Aerospace Systems segment and its divisions; and
- strengthening the Company's procedures for the review of employee concerns regarding violations of the Company's accounting policies and ICFR by designating one or more senior employees that will be responsible for ensuring that such concerns are reviewed in an effective manner, including by (i) when appropriate, assigning these matters to subject matter experts for review and resolution, and (ii) informing the appropriate members of senior management and the audit committee on a timely basis about the nature of the employee concerns and the scope and results of such reviews. These senior employees will report to the Company's chief executive officer and the audit committee with respect to such employee concerns.

65.     However, even with the adoption of these plans, L-3 stated that it could not certify that its "ICFR will be considered effective as of December 31, 2014 because we do not expect to complete our testing of remediated controls by such time."  This statement is a further admission by L-3 that its ICFR were inadequate during the Class Period.

66.     L-3 also filed its Form 10-Q for the period ending June 27, 2014 (filed on October 10, 2014), which disclosed that internal review of its Aerospace Systems segment had cost the Company $24 million in outside accounting and legal advisory costs, and that L-3 had received subpoenas for documents and other materials from the SEC and DOJ concerning its internal review related to the misconduct and accounting errors at its Aerospace Systems segment.

67.     The same day, the Company's senior officers, including Defendants, held a conference call with investors and analysts to discuss the Company's financial results. The

earnings presentation included the following summary of the internal review's pretax income charges:

### Internal Review Pretax Charges - - Reconciliation from Preliminary July 31st to Final October 10th

($ in Millions)

| | |
|---|---:|
| **Preliminary July 31st** | **$ 84** |
| Logistics Solutions: | |
| - Excess spare parts inventory Net Realized Value (NRV) | 20 |
| - Unbilled receivables and inventory NRV | 16 |
| - Other | 5 |
| Platform Systems: | |
| - Losses on an international aircraft modification contract | 14 |
| - Losses on two contracts for rotary wing subassemblies and parts | 15 |
| - Write-off of deferred cost for aerostructures design and testing for a new commercial aircraft | 15 |
| **Final October 10th** | **$ 169** |

Third Quarter Earnings Call | October 30, 2014    10

### Internal Review Pretax Charges by Period

($ in Millions)

| | Before 2011 | 2011 | 2012 | 2013 | 1Q14 | 2Q14 | Total |
|---|---|---|---|---|---|---|---|
| Army C-12 | $ - | $ (3) | $ (16) | $ (35) | $ (4) | $ (11) | $ (69) |
| Other | (4) | (2) | (11) | (11) | (5) | (15) | (48) |
| Logistics Solutions | $ (4) | $ (5) | $ (27) | $ (46) | $ (9) | $ (26) | $ (117) |
| Platform Systems | $ - | $ - | $ 2 | $ (14) | $ (11) | $ (29) | $ (52) |
| Total | $ (4) | $ (5) | $ (25) | $ (60) | $ (20) | $ (55) | $ (169) |

Third Quarter Earnings Call | October 30, 2014    11

68.    In sum, L-3's admissions in its releases on July 31, September 26 and October 10, 2014, reflect accounting fraud that resulted from the intentional misconduct of its officers and L-3's lack of proper and sufficient ICFR.    The fraud caused the

misstatement of $169 million to its largest division, a fact that was plainly material to investors (including Plan participants).

**D.  L-3's False and Misleading Statements During the Class Period**

69.    The Class Period starts on January 30, 2014.  On that day, L-3 issued a press release announcing its fourth quarter and fiscal 2013 financial results for the period ended December 31, 2013.  The Company reported net income of $196 million on net sales of $3.256 billion in the fourth quarter, and net income of $778 million on $12.629 billion in sales in fiscal year 2013.

70.    On this news, the price of L-3's common stock rose more than $7 per share over the next two days, from its close of $103.72 on January 29 to close at $111.07 on January 31.

71.    These statements were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because, as L-3 admitted at the end of the Class Period:

(a)    cost overruns on a fixed-price maintenance and logistics support contract were inappropriately deferred, resulting in an overstatement of the Company's operating income for 2013 of $60 million; and

(b)    the Company's net sales with respect to the fixed-price maintenance and logistics support contract were overstated.

72.    On February 25, 2014, the Company filed its annual financial report on Form 10-K with the SEC.  The Form 10-K provided financial results similar to those stated above and also reiterated L-3's previously reported financial reports for the fiscal years ended December 31, 2010, 2011 and 2012.  L-3 also stated that management had

determined that it maintained sufficient ICFR at a reasonable assurance level, and Defendants issued Sarbanes-Oxley certifications.

73.     These statements were materially false and misleading at the time they were made, and omitted material information required to be disclosed, which L-3 admitted at the end of the Class Period in its amended filings that restated its earnings and finally disclosed material weaknesses.

74.     On May 1, 2014, before the market opened, L-3 issued a press release announcing its first quarter 2014 financial results for the period ended March 28, 2014. The Company reported net income of $180 million on net sales of $2.971 billion, and it certified that its results were accurate.

75.     These statements were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because, as L-3 itself admitted at the end of the Class Period:

(a)     cost overruns on a fixed-price maintenance and logistics support contract were inappropriately deferred, resulting in an overstatement of the Company's operating income for 1Q14 of $20 million;

(b)     the Company's net sales with respect to the fixed-price maintenance and logistics support contract were overstated; and

(c)     the Company's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition and results of operations of the Company.

76.     In fact, L-3 admitted to accounting fraud in its Amended 10-K filing. The Amended 10-K reported a total of $169 million of Aerospace System financial

misstatements which it characterized as follows: (i) $69 million as being associated with improperly deferred cost overruns, improperly recognized sales, overstated inventory and receivables, and the failure to timely and accurately perform estimates on L-3's U.S. Army C-12 fixed-price maintenance and logistics support contract within its Aerospace Systems segment's Army Sustainment division; (ii) $48 million as being associated with overstated inventory and receivables on other contracts within the Logistics Solutions sector; and (iii) an additional $52 million of accounting misstatements as being associated with improperly deferred losses within the Aerospace Systems Segment's Platform Systems sector.

77.    The Amended 10-K disclosed that $135 million of the total $169 million in Aerospace System financial misstatements related to the Class Period, with misstatements totaling $60 million, $20 million and $55 million being improperly recorded during the year ended December 31, 2013, the quarter ended March 28, 2014 and the quarter ended June 27, 2014, respectively.

78.    In addition, L-3, in the Amended 10-K, admitted that the above-noted accounting misstatements within its Aerospace Systems segment were attributable to "numerous" and "intentional" overrides of controls, including those associated with:

- Inventory valuations;
- Inventory counts;
- Receivable valuations;
- Contract invoices;
- Contract estimates review and approvals;
- Cost overrun recognition;
- Quarterly financial statement review and analysis; and
- Journal entry preparation, review and approval.

79.    L-3 also admitted that it did not maintain an effective "control environment" at its Aerospace Systems segment, and that it "did not perform reviews of certain employee concerns regarding violations of the Company's accounting policies" and that, as a result,

it plans to strengthen its "procedures for the review of employee concerns regarding violations of the Company's accounting policies. . . ."  Accordingly, L-3 has admitted that it failed to adequately address employee concerns about violations of then-existing accounting policies.

80.    In addition, L-3 has now disclosed that, as a result of the foregoing improprieties, it fired its Aerospace Systems segment CFO, the President and General Counsel of the Logistics Solutions sector, and the President and Vice President of Finance of its Army Sustainment division.

81.    L-3's restated financial statements were material.  L-3's net income for the year ended December 31, 2013 to be overstated by *5.2%*; and L-3's pre-tax income during the quarter ended March 28, 2014 to be overstated by *8.1%*.  These overstatements of income during the Class Period were quantitatively material.

82.    Additionally, the Aerospace Systems segment is part of L-3's core operations, accounting for more than 36% of the Company's operating income and revenues during 2013, and the Aerospace Systems financial misstatements caused the results of L-3's significant Aerospace Systems segment to be materially misstated in the following respects:

- the operating income of the Aerospace Systems segment for the year ended December 31, 2013 was overstated by *14.2%*;

- the operating margin of the Aerospace Systems segment for the year ended December 31, 2013 was overstated by *14%*;

- the operating income of the Aerospace Systems segment for the quarter ended  March 28, 2014 was overstated by *21.3%*; and

31

- the operating margin of the Aerospace Systems segment for the quarter ended March 28, 2014 was overstated by *19.3%*.

83.    L-3 has admitted that the financial misstatements within its Aerospace Systems segment were caused by the "intentional" override of "numerous" accounting controls, includes those associated with the "review and analysis" (as opposed to the preparation of) division quarterly financial statements, and the "review and approval" (as opposed to the preparation of) contract estimates, and journal entries. Accordingly, L-3's management, *including Defendants*, as part of their accounting review and approval processes, intentionally overrode numerous accounting controls.

84.    As noted above, when L-3 made public its financial misstatements, the price of L-3's common stock declined more than 12%, generating a market capitalization loss of approximately $1.25 billion.

**E.  The Allegations from Former L-3 Employees About Fraud and the Purported Whistleblower**

85.    In 2010, it was announced that L-3's Special Support Programs Division had been suspended by the United States Air Force (the "Air Force") from doing any contract work for the U.S. federal government (the "Government").  A U.S. Department of Defense investigation had reportedly found that the Company had "used a highly sensitive government computer network to collect competitive business information for its own use." A U.S. federal criminal investigation ended the temporary suspension on July 27, 2010, when L-3 and the Air Force entered into an administrative agreement (the "Administrative Agreement") that outlined certain corrective actions that L-3 was required to undertake in order to end its suspension as a federal government contractor.  The duration

32

of the Administrative Agreement was to be three years from the date the agreement was executed.

86.    Pursuant to the Administrative Agreement, L-3 was required to maintain a self-governance program that included an Ethics and Business Conduct Program (the "Program") that covered all employees. The Program was established to ensure that L-3 and each of its employees maintained the business honesty and integrity required of a Government contractor and that L-3 operated in strict compliance with all applicable laws, regulations, and the terms of any contract. The Administrative Agreement provided that Vice President of Internal Audit and Corporate Ethics Officer, Fred Piccirillo (the "Ethics Officer"), was responsible for managing all aspects of the Program.

87.    The Administrative Agreement emphasized the need for whistleblowers within L-3 to convey their concerns about any improper or inappropriate conduct within L-3 regarding, among other things, contracts with the Government. For example, the Administrative Agreement mandated L-3 to post notices in prominent places listing a toll-free telephone number for employees to report concerns anonymously and encouraged individuals to report issues or seek guidance on any aspect of the Company's business. The notices also provided phone numbers to report fraud, waste, abuse, and/or security violations to the Inspector General of the Department of Defense.

88.    The Air Force saw the need for Defendant CEO Strianese to play an integral role in executing the Administrative Agreement. Pursuant to the Administrative Agreement, Defendant Strianese and the Ethics Officer were responsible for ensuring that the Company maintained and updated a written Code of Ethics and Business Conduct (the "Code") as necessary, as well as for providing periodic audits (at least once each calendar

year) of the Company's business practices, procedures, policies, and internal controls for compliance with the Administrative Agreement, the Code, and the special requirements of Government contracting, including monitoring and auditing to detect misconduct, periodic evaluation of the effectiveness of the Program and periodic assessment of the risk of misconduct, with appropriate steps to modify the Program as necessary to reduce the risk of misconduct as identified through this process.

89.    The Ethics Officer was required to report to Defendant Strianese in person and in writing not less than quarterly concerning the Company's Program and compliance with the Administrative Agreement.  Defendant Strianese, the Ethics Officer, and Defendant D'Ambrosio all served together the Audit Committee of the Boards of Directors of L-3 Communications Holdings, Inc. and L-3 Communications Corporation which was required to meet at leave five times per year.  The minutes of the Committee's December 12, 2013 meeting show that the Ethics Officer updates the Committee with a review of ethical concerns that have been reported to L-3, including those concerns reported by employees through L-3's "Ethics Helpline."  Defendant Strianese was required to take whatever actions were appropriate and necessary to ensure that the Company conducted its activities in compliance with the requirements of the law and sound business ethics.  The Company was required to provide to the Air Force copies of such written reports.

90.    Moreover, each calendar quarter, Defendant Strianese was required to submit a written report to the Air Force describing the measures taken by the Company during that quarter to ensure compliance with the Administrative Agreement.  Among other things, the written reports were required to include a separate report identifying all calls made to the L-3 internal confidential toll-free line regarding instances of suspected

misconduct brought to the attention of management through any other channel during the preceding quarter.  Such reports required detailed information, including summaries of the facts of each matter, stating the date and source, medium of the report, the date and nature of the reported conduct, type and results of any internal investigation, corrective and/or disciplinary action and date of feedback to the source of the information.  If the Company had received no reports, L-3 was required to report that fact as well.

91.    As a result of L-3's entry into the Administrative Agreement, and his central role in the performance of that agreement, Defendant Strianese was on alert that the Company needed to maintain adequate internal controls to root out employee misconduct, including through an effective process to address concerns of whistleblowers.  However, by its own subsequent admission, the Company—and Defendant Strianese's—Class Period procedures relating to the review of employee concerns failed.

i.    L-3's Army C-12 Contract

92.    As part of the investigation into the facts underlying this action, Plaintiff incorporates facts set forth in the publically filed operative complaint in *Patel v. L-3 Communications Holdings, Inc., et al.*, No. 1:14-cv-06038-VEC (S.D.N.Y.) that were obtained during interviews with former employees of L-3 who had extensive knowledge of, and experience with, the contract at the heart of the misconduct alleged herein.

93.    As L-3 admitted at the end of the Class Period, the misconduct primarily related to: (1) contract cost overruns that were inappropriately deferred; and (2) overstatements of net sales, both with respect to a fixed-price maintenance and logistics support contract, *i.e.*, L-3's contract to maintain U.S. Army C-12 airplanes.  ***These former***

*employees provided information that illustrates the misconduct in connection with the*
*C-12 contract that was admitted by L-3 after the Class Period.*

94.    Former Employee No. 1 ("FE1") worked within L-3's Aerospace Systems segment in the Army Sustainment division ("ASD") as a member of the Army Support section in Huntsville, Alabama.

95.    FE1 served as the Aircraft Engine Manager from March 3, 2013 to March 10, 2014.  He served as the Ground Support Equipment Manager from March 10, 2014 through October 31, 2014.  As part of his job responsibilities, FE1 prepared monthly forecasts of the number of engine overhauls required to be performed by L-3 pursuant to L-3's contract to maintain U.S. Army C-12 airplanes.  According to FE1, the Army C-12 contract is the Army's largest fixed-wing-aircraft contract.  The C-12 fixed-wing unit flies Transport, Special Equipment Mission Aircraft, and Reconnaissance missions all over the world.  L-3's C-12 contract provides maintenance for all of the U.S. Army's fixed-wing aircraft.

96.    According to FE1, the organizational structure within the Aerospace Systems segment was as follows: the Army Support section reported to ASD; ASD reported to Aerospace Systems; and Aerospace Systems reported to the corporate office in New York, which included the CEO and CFO.

97.    Rick Schmidt was the Program Director at the time FE1 was hired, and was the senior-most executive to whom FE1 directly reported.  FE1 stated that Finance Director Kevin Nugen, Maintenance Director Brad Hall, and Logistics Director Eric Post reported to Schmidt and later Roderick Hynes.  Schmidt/Hynes reported to ASD Vice President &

CFO David Pruitt, who, in turn, reported to ASD President Mark Wentlent, who, in turn, reported to Aerospace Systems segment CFO Gordon Walsh.

98.     There were approximately five managers who reported to the aforementioned executives.  One was the Whistleblower, who ultimately blew the whistle on the intentional misconduct occurring in the Aerospace Systems segment.[2]  The Whistleblower was on the same reporting level as FE1, and they interacted with each other on a regular basis.

ii.     Forecasts Prepared by FE1 Were Manipulated by His Superiors

99.     Part of L-3's responsibilities under the C-12 contract was to inspect the aircraft in order to properly maintain them.  According to FE1, aircraft inspections are based on hours flown.  FE1 was also responsible for forecasting the number of engine overhauls that L-3 needed to perform under the C-12 contract.

100.    FE1 compiled his monthly forecasts into a spreadsheet, which was known as a short- term integrated forecast ("STIF"), and presented the numbers to the Whistleblower.  They would then have a manager-level meeting to discuss and finalize those numbers.  After the numbers were confirmed at the manager level, the STIF report would be sent to the Program Director.  The STIF report was then sent to Pruitt and Wentlent for their approval, and then to Walsh.  FE1 explained that it was difficult to forecast the number of engine overhauls he would need to perform monthly because the Army did not strictly adhere to the maintenance schedules.

101.    FE1 stated that he attended monthly meetings comparing actual vs. forecasted numbers, which were chaired by the Whistleblower, and the actuals were always

off the forecasts.  According to FE1, it was at those meetings where they would get their "bludgeoning" to make their numbers.

102.    Pressure to increase the forecasted numbers was applied on FE1 directly by Wentlent, the ASD President.  For example, in October 2013, FE1 had forecasted four engine overhauls for the month on the STIF report.  He had already achieved his forecasted goal when he ran into Wentlent in the hallway.  Wentlent – whose office was three doors down from FE1 but did not know FE1's name, only referring to him as the "engine guy" – asked FE1 how he was doing.  FE1 told Wentlent that he had already achieved his forecasted goal of four engines.  According to FE1, Wentlent seemed surprised and said to FE1: "Four engines? You mean *eight*." (emphasis in original.)  FE1, knowing that he only forecasted four engine overhauls, simply agreed with Wentlent.  FE1 then confronted the Whistleblower and asked him if he changed FE1's STIF numbers.  The Whistleblower told FE1 that he could not discuss it, but all FE1 had to worry about was his four engines.  FE1 assumed that the Whistleblower was simply going to fix the STIF report.

103.    According to FE1, he had a similar conversation with the Whistleblower about the STIF numbers in December 2013.  Again, the Whistleblower told FE1 not to worry and he was going to take care of it.  And again, FE1 believed that the Whistleblower was going to make sure that the correct numbers were reported in the STIF report.

104.    FE1 stated that in December 2013, it was rumored that there were serious problems, or "foul play," going on with the C-12 contract.

105.    FE1 stated that Wentlent always told him to "push the engines" and one time told him to bring in more revenue, and Wentlent did not care where the revenue came

from, either the left or the right, which FE1 understood to mean that if he couldn't get revenue from engines, he should get from "hot inspections," landing gear or props.

106.   FE1 further stated that the managers at his level were always under pressure to "make their numbers."   At one meeting attended by FE1, the Whistleblower, and Schmidt, the Whistleblower was in the "crosshairs," and told Schmidt that the numbers could not be achieved.   Schmidt told the Whistleblower to "unf*ck this," and "get us what we need."   According to FE1, the Whistleblower attended a lot of meetings with the "higher-ups" where they "put the screws" to the Whistleblower.   On some occasions, FE1 did not physically have the number of engines that senior management told him he needed.

107.   FE1 had participated in at least four inventory audits which he considered "a waste of time" because the inventory lists did not match what the Company actually had in stock.   ***FE1 had seen a document that indicated that L-3's C-12 program had 100% of the required landing gear inventory in stock, including heavy gears.   However, FE1 knew for a fact that the heavy gears were not in stock and they were only able to get them by turning in the old gears when buying new ones.   Both Tim Oliver, who replaced FE1 as Engine Manager in March 2014, and Brad Hall told FE1 not to say otherwise to Aerospace Systems segment CFO Gordon Walsh***.

   iii.   <u>According to Former Employees, Contract Line Item Number 9 Was Created to Defer L-3's Losses on the C-12 Contract</u>

108.   FE1 explained there were eight contract line-item numbers, or "CLINs," covering every section of the contract.   He further stated that in order to account for the over-and-above charges not reimbursed by the Government, L-3 initiated CLIN Number 9 ("CLIN 9") for the C-12 contract.   FE1 stated that CLIN 9 was used to account for the over-and-above charges.

109.    FE1's insight into CLIN 9 is corroborated by Former Employee No. 2 ("FE2"), who immediately preceded FE1 as Engine Manager and served in that capacity from the outset of the C-12 contract.

110.    FE2 worked as the Aircraft Engine Manager in Huntsville, Alabama from October 2010 through January 2013, when he was promoted to Aircraft Maintenance Manager/Assistant Director of Maintenance.   FE2 held that position until July 2013.   As an Aircraft Maintenance Manager, FE2 managed the maintenance for approximately 200 Army C-12/RC-12/UC-25 aircraft, and controlled the daily activities of five regional managers and 480 U.S. and overseas mechanics located in 84 different regions of the world. As an Aircraft Engine Manager, FE2 managed repairs, overhauls and inspections of those airplane engines.   He also oversaw the L-3 subcontractors who overhauled the airplane engines.

111.    FE2 said that he was hired in October of 2010 to work on the new L-3 Maintenance and Logistics contract for the C-12 aircraft with the U.S. Army in Huntsville. He said the contract started at the end of 2010 and was to run until January 2015.   FE2 explained that the contract was broken up in two parts.   The Maintenance & Logistics portion was a "firm-fixed price" contract that was only billable to the Government at a firm-fixed price, meaning that L-3 had to cover all the costs associated with that portion of the contract.   On the other hand, the second portion, which he termed, "over and above with cost reimbursement," was billable to the Government as needed.   FE2 further explained that the contract allowed for over-and-above costs related to aircraft repair parts "outside of routine repair and maintenance." These costs were submitted to the Government for reimbursement, and, thus, were a profit center for the Company.

40

112.    FE2 knew and worked with ASD vice president and CFO David Pruitt.  FE2 explained how Pruitt started working on the C-12 contract.  According to FE2, from early on, L-3 was suffering from cost overruns, which the Government later refused to pay for. As a result, L-3 assembled what the Company called a "Red Team," a team of experts to come in and figure out how to effectively service the contract.  The Red Team was assembled from L-3 employees from other contracts and programs.  According to FE2, "They are basically coming in to audit or investigate the program or contract that is suffering or having some trouble in some areas."  FE2 stated that Pruitt was on either the third or fourth Red Team brought in by L-3 to deal with the contract problems.  FE2 stated that the Red Team prior to Pruitt's was led by Wentlent.

113.    Explaining the problem with the C-12 contract, FE2 stated: "the division of L-3 that ended up executing the contract was not the division that wrote the proposal for the contract." According to FE2, the proposal was written to include items on the fixed-price side that were not economically viable to L-3.

114.    FE2 stated that the Government paid L-3 a firm-fixed price to overhaul C-12 aircraft engines.  L-3 subcontracted maintenance work to vendors, and the price that the Government paid to L-3 was higher than the price L-3 paid the vendor that performed the work.

115.    FE2 explained that an aircraft engine, like a car, is supposed to be inspected on a periodic basis.  For example, once an aircraft engine operates for 3,000 hours, it needs to be taken off of the aircraft wing and sent into a repair facility.  As part of that process, the vendor takes the engine, and as a part of the subcontract with L-3, their firm-fixed price is to disassemble the engine, inspect it, and provide a report that explains what is wrong

41

with it.  According to FE2, "that's all the firm fixed price gets you." On the other hand, "any parts that are required to be changed because they're broken, they're not operating correctly, those are your over-and-above" costs.

116.    However, problems arose with the C-12 contract because L-3 was requesting reimbursement from the Government for over-and-above costs that were considered, per the terms of the contract, firm-fixed costs.  FE2 explained that, "when the subcontractor says, I'm going to need $100,000 to make this engine whole again, L-3 says that's fine and they pass that cost onto the Government and say, we need $100,000 to make that engine whole again." In the case of the C-12 contract, frequently the Government told L-3 that it was not going to pay for certain parts, "so we're not going to give you $100,000, we're going to give you $75,000 because the $25,000 that you are requesting in over-and-above parts, that was negotiated in your firm fixed price . . . L-3 says, well now we don't have enough money to finish the engine, we need $100,000 and the government only gave us $75,[000], so now you have a cost overrun."

117.    According to FE2, "when you do that . . . you're doing roughly 50 engines a year, at an average price of about $250,000 to $300,000 each, when you're overrunning, that's just an overrun on your parts, and there is a separate piece on the firm-fixed price for a lease engine."

118.    FE2 explained that the engine overhaul vendor would not release an engine until it was paid.  However, L-3 was not budgeted or able to pass along the cost overruns to the Government because of the terms of the contract.  This, in turn, led to a backlog of completed engines held by the vendor.  This backlog also required L-3 to supply, at its cost, the lease engines for longer periods of time so the aircraft can continue to fly.  Asked

for specific examples of which engine overhauls had cost overruns, FE2 responded, "Just about every one of them had." FE2 explained: "it's kind of like having a rent-a-car while your car is in the shop.  [S]o your insurance company says, we'll pay for 5 days of rent-a-car while your car is being repaired, but [if] you keep it 6 months, you just overran the cost of what your insurance company is going to reimburse."

119.    Asked how the cost overruns were reported up the chain of command, FE2 said that he, as the Engine Manager, had the responsibility to verify what repairs an engine needs, and he prepared a monthly STIF report that he forwarded to the financial section in the Huntsville office.  The STIF report included the number of engines that he believed he could have completed and billed for in that month, as well as in that quarter.  He said: "based on how those engines are flowing through the process, I'm either showing a profit or I'm showing a loss to the business manager here in Huntsville."

120.    FE2 stated that he first observed cost overruns associated with the C-12 contract "when the contract first started." He added that in the beginning of the C-12 contract, there was no CLIN 9,[2] and he would fund the non-funded over-and-above costs using a CLIN number for Site Maintenance, which at that time skewed the actual Site Maintenance cost numbers.  *He further stated that he believed that CLIN 9 was created to give the appearance that the contract was making money and to defer losses*.

121.    FE1 stated that the financing associated with the C-12 program was in "serious disarray" when he first started, which caused him to work 70-90 hours per week

---

[2]    FE2 added that the Work Break Down Structure laid out all the work to be done in the contract and which CLIN was going to fund the costs. Invoices from the vendors were coded at the program level before they were sent to L-3's Greenville, Texas office for payment.

for nine straight months.  According to FE1, when he started, there were 13 completed engines sitting with the vendor because L-3 had not yet paid the invoice.  He stated that Cessna Aircraft had stopped doing business with L-3 three times in 2014 because L-3 was not paying their invoices associated with the C-12 contract.  When FE1 first started working for L-3, the C-12 contract was in the "Red" status.  Towards the end of his employment, the contract was upgraded to "Yellow." FE1 explained that it was a common practice among many Government contractors to color-code the status of their contracts: Red, Yellow or Green.  FE2 explained that "Red" means the contract is losing money; "Yellow" means some areas of the contract have difficulties that can be worked on; and "Green" means the contract is bringing in revenue and doing well.

122.    FE1 recalled putting at least $250,000 through CLIN 9.  He stated that there were parts and services billed for as over-and-above that the Government had already argued were included in the firm-fixed portion of the contract and for which the Government was not going to pay.  Thus, FE1 reiterated that many of these parts should not have been included in CLIN 9 in the first place because the contract did not provide for reimbursement for them.  At one point, all CLIN 9 costs had to be signed-off on by the Program Director or Program Manager.

123.    According to FE1, L-3 owed a vendor $3.5 million, and the Company paid for the engines to get them released.  The vendor did not care who paid it, so L-3 paid it, and, therefore, $3.5 million went into CLIN 9.  According to FE1, **_CLIN 9 was needed to keep the paperwork moving_**.  FE1 believed that CLIN 9 was set up by Gordon Walsh.

iv.    L-3's Corporate Office Was Aware of
       Cost Overruns in the C-12 Contract

124.    FE2 stated that, early on in the contract, he participated in almost daily

conference calls with personnel from the New York corporate headquarters regarding cost

overruns associated with the C-12 contract.  At that time, FE2 already had approximately

ten completed engines being held by the vendor because he did not have the money in the

budget to pay them.  "The Government had funded everything that they were going to fund,

and I was just waiting on the Company's decision to say, here's how we're going to move

the engines, either we are going to pay for it out of L-3 funds or we are going to keep

battling with the Government."  FE2 said that this happened before Wentlent and Pruitt

came to Huntsville, but Walsh was involved at the time and would have been aware that

Huntsville personnel were speaking directly to corporate personnel in New York.

125.    FE2 explained that his experience with conference calls with the New York

corporate office regarding the financial condition/situation of the program were in the early

2011 time period.  Approximately one month after the conference calls started, FE2 was

no longer asked to participate in them.  FE2 recalled a new Red Team coming every year

while he was employed at L-3.  According to FE2, "***Most likely the Red Team was a

product of the calls and the problems with the contract***."[3]

126.    According to FE1, in the late summer or early fall of 2013, Defendant

Strianese came to the Huntsville, Alabama office for a series of meetings that lasted two or

three days.  With the possible exception of Brad Hall and the Whistleblower, Defendant

Strianese only met with senior executives.  FE1 was actually surprised that Strianese did

---

[3]      All emphasis is added unless otherwise noted.

not meet with the managers.  FE1 believed that Strianese would not make a site visit unless there was a real problem.

        v.      The Whistleblower Reported the Misconduct
                to L-3 Corporate Headquarters

127.    According to FE1, in either late December 2013 or early January 2014, Pruitt was demoted from Vice President to a director position, and transferred to L-3's Fort Rucker, Alabama site.  FE1 stated that, approximately seven-to-ten days later, Pruitt was fired.  Indeed, Pruitt's own LinkedIn page indicates that he left L-3 in January 2014. According to FE1, after Pruitt left, it was obvious that something was going on.

128.    In February or March 2014, FE1's suspicions about his STIF numbers being manipulated were bolstered.  At that time, FE1 started hearing rumors that somebody had intentionally changed his STIF numbers and that other financial problems were discovered. He also heard rumors that the Whistleblower had blown the whistle about the improprieties FE1 witnessed.  In February or March 2014, FE1 had a private conversation with the Whistleblower regarding the rumors, and told the Whistleblower that he heard the Whistleblower was the one who blew the whistle.  During this conversation, the Whistleblower confirmed that he had blown the whistle to L-3's corporate headquarters in New York via telephone.  During this conversation, FE1 told the Whistleblower that he did the right thing and that FE1 himself would have eventually reported the problems.  The Whistleblower told FE1 that he was the first person to acknowledge that the Whistleblower did the right thing.

129.    Based on his conversations with the Whistleblower in December 2013 and February/March 2014, as well as the timing of Pruitt's demotion and subsequent termination in December 2013 and January 2014, respectively, FE1 believes that the

Whistleblower first reported all of the negative and money-losing issues associated with the C-12 contract to L-3's corporate office in New York in December 2013.

130.    FE1 stated that the Whistleblower flew to New York in March or April 2014 to meet with the Company's senior executives.  According to FE1, the Whistleblower was recently promoted.  Upon information and belief, Defendants were among those made aware of what the Whistleblower had to say.

131.    According to FE1, the following L-3 employees were fired as a result of the Whistleblower's statements:  Gordon Walsh, Mark Wentlent, and David Pruitt.  According to FE2, Logistics Solutions sector general counsel Steve Sinquefield was also fired.

## F.  L-3's Fraud Revelations Impact Its Stock Price

132.    During the Class Period, L-3, through public statements and securities filings made and vouched for by Defendants, made false and misleading statements which deceived the market and artificially inflated the price of L-3 common stock.  When the misrepresentations and fraudulent conduct became apparent to the market, the price of L-3 common stock fell precipitously, as the prior artificial inflation came out of the price.

133.    On July 31, 2014, before the market opened, L-3 made its first disclosure about its "internal review" for allegations of misconduct and accounting errors.   In response, the price of L-3 common stock fell from $118.35 per share the previous day, to close at $103.83 per share, down approximately $15 per share, or 12%, from its close the prior day, on very unusual high trading volume of more than 5.4 million shares trading.

134.    During the July 31, 2014 earnings call, which was led by Defendants, and in subsequent written reports, securities analysts expressed their concern with L-3's disclosure of intentional misconduct and accounting misstatements.

135.    During the call, a Shapiro Research analyst expressed concern about L-3

management's controls.  The following exchange took place:

> **George Shapiro – Shapiro Research – Analyst**
> *I guess my question really gets along to kind of management controls. If this contract has been ongoing since I think you said December 2010, what took so long to find out what's going on and how do we get confidence that this is not – we are not going to find stuff elsewhere*?

> **Michael Strianese – L-3 Communications Holdings, Inc. – Chairman, President & CEO**
> George, we have really no indication that there is anything elsewhere. And in terms of what took so long, well, you presume the issue began when the contract began, which I don't believe is the case, but I am really restricted into getting into details given the ongoing nature of the matter.

136.    Analysts were also concerned about the pervasiveness of the misconduct.

The following exchange took place during the call:

> **Joe Nadol – JPMorgan – Analyst**
> Okay, so the natural question is how far along are you in your investigation? How long has this been going on? How long have you known about this? And how much conviction do you have that –? I know you say this is isolated to the one contract, but –.

> **Ralph D'Ambrosio – L-3 Communications Holdings, Inc. – SVP & CFO**
> We said it was primarily isolated to one contract. . . .

> **Joe Nadol – JPMorgan – Analyst**
> *How do we know? The big question everyone is going to be wondering is – whether this one contract is $84 million or $120 million isn't the issue, it's is this possibly pervasive elsewhere on other fixed price contracts within this segment*?

> **Michael Strianese – L-3 Communications Holdings, Inc. – Chairman, President & CEO**
> Again, as you know, it is – I keep having to repeat it – ongoing. But as to what we know as of this morning, there has been nothing identified that suggests that this was beyond the borders that we have found, nor involving employees beyond those that have already been terminated.  We don't have that absolute assurance because we are not complete yet, but with every day that goes by we get more confident when nothing else comes up. But, again, we want to run this to completion and, as you know, we will.

137.    Although Defendant Strianese sought to inspire confidence in the Company's internal controls by proclaiming that L-3's internal control system worked because the Company found the misconduct, analysts were incredulous. The following exchange took place during the July 31 call:

**Ron Epstein – BofA Merrill Lynch – Analyst**
Good morning, thanks for taking my question. Not to beat a dead horse, but I'm going to a little bit here. My apologies for that in advance. ***Can you give us more color around just the point of failure? In your prepared remarks you mentioned that your internal system did work because you found it. And I guess maybe Joe was driving at this a little bit, but it happened in the first place***. I guess you will see it in the market today. The worry will be just – and I know you have said you haven't seen any place else, but ***how can you make investors feel comfortable that it really is contained? Can you tell us what the point of failure was and how you can assure us it's not going to happen again***?

**Michael Strianese – L-3 Communications Holdings, Inc. – Chairman, President & CEO**
Again, Ron, the investment – the inquiry is ongoing. The corporate review is ongoing and we have outside experts engaged, including some very high-power resources in the field. ***But the people involved have been fired. They are gone. So that gives me a lot of confidence that that was the failure point because we have some bad actors and they are no longer part of L-3***. And that is my answer.

138.    On July 31, 2014, an Oppenheimer analyst noted, in a research report, the devastating impact of L-3's disclosure on investor confidence, and the concern that the misconduct was discovered by a whistleblower, rather than corporate controls:

LLL had a mostly solid performance in 2Q but also uncovered financial misconduct stretching back to 2011 at the Aerospace segment. At least five employees at multiple levels of LLL were involved in a scheme that inflated income by overreporting revenue and underreporting expenses on a $150M/yr maintenance contract. The discovery reduces previously reported income by a total of $84M. ***But the bigger impact is to investor confidence***. LLL believes it has discovered the whole of the misconduct. We have no specific reason to doubt it, but experience teaches that plots of this ilk often thicken before they dissolve. ***Also less than reassuring is that the misconduct was discovered by a whistleblower, according to the WSJ, rather than corporate controls***.

139.    On the same day, a Drexel Hamilton analyst echoed the damage done by the disclosure to investor confidence in L-3:

> We are downgrading our rating on shares of LLL to Hold this morning following the firm's announcement that it is conducting an internal review related to an accounting issue at its Aerospace Systems unit. Shares are up 12.0% YTD and are likely to struggle in light of the announcement this morning, in our view.
> • The firm will take an $84m pre-tax charge related to the issue and results this morning are viewed as preliminary in light of the review.
> • *While we view the issue as likely isolated, we think the market will take some time to regain confidence in LLL given current skittishness we have observed in the market*.

140.    On August 1, 2014, an RBC Capital Markets analyst also noted the damage done by L-3 to investor confidence:

> **There goes 16% of the market cap**
> Accounting issues in companies tend to prompt a violent reaction, and L-3's share price was duly hammered on the back of this news. *Management tried to reassure investors that the issue is isolated, but clearly many do not want to stick around to see if this is true. . . . Whilst the stock could regain some of yesterday's sell off, it may be a while before investors fully regain their confidence*.

141.    Even after the Company had announced the conclusion of its internal review, analysts remained cautious. On October 13, 2014, a Drexel Hamilton analyst wrote: "*We expect the firm may eventually put this unfortunate episode in the past, but we think it will take at least a couple of quarters for the market to regain confidence in LLL*."

142.    Likewise, on October 28, 2014, a JPMorgan analyst questioned the impact of newly announced charges on the future profitability of the Aerospace Systems segment:

> **Impact of additional charges on future Aerospace profitability is a key question.** We know that the C-12 contract that initially led to the accounting review expires in January of next year, so the potential for lingering pressure from that contract is relatively limited. *However, as mentioned, the review led to additional charges in the Logistics Solutions and Platform Systems sectors and the future impact of those discoveries remains to be seen*. The net impact of

those charges on operating income was $9 mn in 2012, $25 mn in 2013 and $60 mn in 1H14. The 1H14 figure probably includes some one-time catch-ups but *the overall charges are in part due to improper accruals on certain logistics support contracts as well as losses on four aircraft contracts, so there is likely to be some ongoing pressure from those issues. Given the ramp of the charges, we can envision these pressures lasting into 2016 and we are reducing our Aerospace margin forecasts for 2015 and 2016 by 100 bps and 70 bps, respectively, to 9.5% and 9.6%*.  On the Q2 call management had indicated that its initial 2015 outlook, including 30 bps of y/y expansion in core margin for the entire company, was unchanged by the preliminary findings of the review, and *a key question this earnings call will be if that outlook remains intact following the incremental discoveries in the Aerospace segment*.

143.    On October 30, 2014, a Barclays analyst noted "cautious sentiment from investors" arising from the Company's internal controls issues:

> *We noted cautious sentiment from investors we spoke to going into the print, which is understandable given the nature of the internal controls issues*, but the quarterly performance itself was not as important as the sentiment around forward-looking impacts. LLL continues to offer a similar value proposition as other defense primes, *albeit with slightly greater risk in the eyes of many investors over the last quarter.*

144.    As a result of L-3's—and Defendants'—materially false and misleading statements and omissions as set forth above, Plan participants who invested in the L-3 Stock Fund purchased the stock at inflated prices during this time; they also held L-3 stock while forgoing other, prudent investment alternatives in reliance on the stock price and public news about L-3.  For example, the three largest other investment options under the Plan, American Growth Fund of America, Spartan 500 and T. Rowe Price Small Cap had returns, respectively, of 9.3%, 13.59% and 6.9% during 2014.

145.    When the truth came out, L-3's stock price fell steeply as the negative news factored into a new stock price, and the artificial inflation of the price dissipated.  Plan participants, such as Plaintiff and the other members of the class, were significantly damaged as a result of the decline in L-3, and the damage to the Company's long-term

reputation and confidence among investors.  Defendants, who had the fiduciary duties of
protecting Plaintiff and the class from such harm, are directly responsible for these
damages.

### G. January 11, 2017 SEC Order Imposing
### $1.6 Million Fine on L-3 For Accounting Fraud

146.    The SEC's investigation into L-3's "failure to maintain books, records and
accounts that accurately reflected the transaction and dispositions of its assets, and for
failing to maintain a sufficient system of internal accounting controls" resulted in a $1.6
million fine against L-3 and the entering of an Order that L-3 "cease and desist from
committing or causing any violations and any future violation of Sections 13(b)(2)(A) and
13(b)(2)(B) of the Exchange Act.

147.    The facts of the Order state that, as early as mid-2013, L-3 executives
realized that L-3's C-12 Contract (discussed *supra* at V(E)(i)) was projected to lose money
for the fiscal year and that there had been work performed on that contract that had not, in
fact, been billed to the U.S. Army.  In August of 2013, a "Revenue Recovery Initiative"
was developed specifically to identify additional instances where work had been performed
on the C-12 Contract but not billed to the U.S. Army, and to then develop a plan to bill the
U.S. Army for that work.  By November 2013, $50 million of this performed, yet unbilled,
work had been discovered.  It was also during this same month that an employee at L-3
filed an ethics report concerning aspects of the C-12 Contract; an investigation into the
allegations was commenced.

148.    In December of 2013, approximately 69 invoices were generated for this
performed, yet unbilled, work however these invoices were not delivered to the U.S. Army,
yet the $17.9 million in revenue associated with these invoices was recognized.  L-3's

internal accounting controls failed to detect and prevent the improper recognition of this C-12 Contract revenue.

149.    The generation of the invoices prompted another "specific report" to be raised with L-3's internal ethics department–several interviews were conducted to investigate the report.  These are the results of L-3's internal ethics investigators:

> [T]he ethics investigators failed to identify the improper revenue recognition issue because they did not adequately understand the billing process for the C-12 Contract and misinterpreted statements made to them by witnesses.

150.    The SEC's investigation, Order, and monetary penalty further demonstrate the magnitude of L-3's accounting fraud.

## VI.    L-3'S FIDUCIARY BREACHES:  PRUDENT ACTIONS THAT WERE NOT TAKEN

151.    Throughout the Class Period, Defendants knew (or should have known) that there was fraud occurring in the Aerospace Systems segment, its largest division, and that its ICFR were insufficient.  Defendants further knew (or should have known) that these facts were not disclosed to the public, and that the public was therefore relying on the materially false and misleading statements in L-3's SEC filings, earning releases and conference calls.  Defendants knew (or should have known) that L-3's stock price was artificially inflated by the Company's non-disclosures and false and misleading disclosures to the public, that these made the L-3 Stock Fund an imprudent investment, and that a correction in the stock price when the truth came out was inevitable.

152.    The collapse of L-3's stock price due to the exposure of its fraud devastated the Plan's assets and purchasers who overpaid for the stock, and could and would have

been avoided, in whole or in part, if Defendants had complied with their ERISA fiduciary duties.

153.    As Plan fiduciaries, Defendants were required to (a) continually monitor whether L-3 stock was a prudent retirement investment; (b) freeze or restrict additional purchases of the L-3 Stock Fund by the Plan; (c) issue corrective disclosure about L-3; and/or (d) hedge the Plan's exposure given the likelihood of a stock price correction. Notwithstanding these duties, Defendants did nothing to protect the retirement savings of the Plan participants to whom they owed fiduciary duties from harm as the result of the undisclosed fraud and inflation of L-3's stock price.

154.    Defendants knew or should have known that the Company's stock had become imprudent during the Class Period.  Defendants, directly responsible for the Company's financial disclosures as its CEO and CFO, knew or should have known that the Company's financial results were materially misstated, and that there was accounting fraud within its Aerospace Systems segment.  Defendants also knew or should have known that L-3's internal controls had material weaknesses, and that these issues had led to the Company's false and misleading financial reporting.  Defendants, after all, were the very senior officers who knowingly or recklessly participated in and committed the fraud.  As a result, Defendants knew or should have known that L-3's stock was artificially inflated in value and therefore imprudent, and that inevitable harm to Plan participants would result when the truth was revealed.

**A.  Defendants Should Have Made Corrective Disclosures**

155.    Defendants could have issued truthful or corrective disclosures to cure the fraud and make L-3's stock a prudent investment again.  As ERISA fiduciaries, and also

as L-3's CEO and CFO, respectively, Defendants Strianese and D'Ambrosio had duties to communicate material information to Plan participants under ERISA, and duties to correct false and misleading public statements under the federal securities laws. Telling to the truth to the public, rather than continuing to mislead investors and Plan participants throughout the Class Period, would have allowed Defendants to comply with their obligations under both legal regimes simultaneously.

156.    As the Company's senior-most officers and the Sarbanes-Oxley signatories of its federal securities filings, Defendants had the power to disclose the truth to the public and to correct the artificial inflation, particularly because it was largely Defendants' own false public disclosures that had artificially inflated the stock price. Defendants were directly responsible for the Company's disclosures and therefore could have stopped the misrepresentations from happening or corrected them much earlier than they were ultimately corrected, either of which action would have prevented all or at least some of the artificial inflation and consequently lessened the ultimate correction. Either way, Plan participants' losses would have been mitigated, if not altogether prevented.

157.    Defendants cannot argue that the federal securities laws prevented them from making truthful disclosure. In this situation, ERISA and the federal securities laws compelled Defendants to take exactly the same action—tell the truth and correct the inflated stock price. No law or duty required Defendants to *prevent* the disclosure of the truth—quite the opposite.

158.    Additionally, neither Defendant could have reasonably believed that effectuating truthful or corrective disclosure would do more harm than good to the Plan or the Plan participants. First and foremost, defrauding Plan participants by concealing the

truth runs counter to the fundamental obligation under ERISA to be truthful and accurate in communicating with those to whom one's fiduciary duty is owed. Defendants knew that Plan participants were buying and holding L-3 shares whose value was artificially inflated through fraud. At a minimum, Defendants' fiduciary duty of loyalty should have compelled them disclose the truth to correct the fraud and accordingly prevent further inflation in value.

159.    For example, if Defendants had tried to effectuate corrective public disclosure near the very beginning of L-3's fraud—at the beginning of the Class Period— virtually all of the artificial inflation of L-3's stock price that occurred could have been avoided, and virtually no Plan participants who purchased shares of the L-3 Stock Fund would have been harmed. But as the fraud went on and on, more and more Plan participants made purchases at artificially high prices—upon information and belief, at least $30 million worth—and thus the harm to Plan participants steadily increased. As two experts have framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error. However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, *the inflation will be overstated for a much larger group of purchasers.*

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

160.    Defendants also needed to act to prevent future harm and damage to the Plan's approximately $909 million investment in L-3 stock. This position was at risk from

a large stock price correction when the public learned the truth and realized that L-3's management had concealed a fraud.  As time passed, L-3's stock price inflated further due to the fraud and the size of the scandal grew, making the eventual collapse worse.   The concealment of the fraud put the Plan's $909 million holding of L-3 stock at risk for a serious and lasting decline in value, and hurt management's credibility and the long-term prospects of L-3 as an investment.   This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

161.    This reputational damage is not merely speculative.   Economists and finance experts have conducted numerous empirical studies on the matter, and concluded that "the reputational penalty" a company suffers because it perpetrates a prolonged fraud is significantly greater than any regulatory fines or other penalties that it may occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system."   Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008).  Moreover, "*[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 . … [of which] $2.71 is due to lost reputation*."  *See id.* (emphasis added). And this reputational damage, unsurprisingly, increases the longer the fraud goes one.  *Id.*

162.    In this case, Defendants knew or should have known that a price correction caused by the Company's fraud coming to light was inevitable; thus, their primary objective as Plan fiduciaries should have been to ensure that that correction happened sooner rather than later, thus mitigating the reputational harm done to the Company, the Plan, and the Company's stock, as well as to lower the number of Plan participants who

purchased L-3 Stock Fund shares at artificially high prices. Defendants also should have sought a sooner price correction because it would have meant a gentler correction, and, therefore, would have been less punitive to Plan participants simply holding shares of the L-3 Stock Fund—especially those participants who might, for whatever reason, need to access their retirement savings in the near future and would therefore not be able to wait to see if L-3's stock price eventually recovered.

163.    Defendants knew or should have known that the truth would come out eventually for several reasons. First, the Company was under investigation—civil *and* criminal—by federal government regulators, making a day of reckoning and revelation all the more likely. Defendants were well-positioned to know exactly what facts were being uncovered by investigators, and thus they knew or should have known that those regulators would eventually make their findings public. Thus, one way or another, the truth about L-3's misconduct was going to come out.

164.    Second, upon information and belief, Defendants were well aware of the Company's internal whistleblowers who were reporting to senior management about the improper accounting being done at one of the Company's divisions. It was hardly reasonable for either Defendant to believe that L-3's fraud could possibly remain a secret when Company employees were already coming forward to point out the misconduct. Whistleblowers tend not to stay silent for long; their emergence plainly increases the likelihood of public disclosure of the wrongdoing they are trying to reveal.

165.    Third, Defendants were responsible for L-3's compliance with the federal securities laws, and thus they knew or should have known that the Company was obligated to make corrective disclosures under those laws, so even if they chose to ignore their

fiduciary duties under ERISA, the truth—and the "harm" it would cause by reducing L-3's stock price—would be revealed regardless

166.    Finally, Defendants, as experienced corporate executives, should have known that no corporate fraud lasts forever; the misconduct that is being concealed nearly always comes to light in one way or another.  Better for Defendants to have tried to make that revelation happen earlier and thus ensure that less damage to the Plan and Plan participants was caused.

167.    Defendants also should have recognized that the Company, its stock price and the Plan and its participants would all be better off if disclosure of the Company's wrongdoing was made voluntarily by L-3, as opposed to emerging because of government regulators' accusations or media reports derived from whistleblowers' reporting.  The DOJ has long treated companies more kindly that self-report wrongdoing as opposed to those who conceal it as long as possible.  Thus, earlier, voluntarily disclosure by Defendants would have mitigated the reputational harm to the Company, lessened the stock-price correction, and would likely have earned L-3 greater good favor with civil and criminal regulators.  Defendants forewent all of those benefits—all of which would have redounded to the Plan and Plan participants—by failing to make voluntary, corrective public disclosures of the Company's misrepresentations and omissions as early as possible.

168.    Even if Defendants were concerned that correcting the fraud would temporarily lower the stock price, that concern should not have deterred disclosing the truth.  Every stock fraud in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient markets.  The drop in the stock's price is merely a reduction in its artificial inflation, an outcome that benefits Plan participants far

more than it harms them.  In virtually every case of fraud, the longer the fraud persists, the harsher the correction tends to be.  Thus, if Defendants were concerned about doing more harm than good to the Plan and Plan participants, then they should have sought to minimize the harm that correcting the fraud would temporarily cause, which effectively means disclosing the truth sooner rather than later.  Better yet, they should have told the truth from the beginning and prevented any artificial inflation from occurring in the first place.

169.    Indeed, earlier disclosure by Defendants would have not merely have mitigated the harm to the Plan and Plan participants, but it would have affirmatively benefitted them as well.  With the truth about L-3's accounting issue, Plan participants could properly evaluate the L-3 Stock Fund versus their other investment alternatives for their retirement savings. Over the long term, Defendants' failures to act as Plan fiduciaries to expose corporate fraud is likely to have a chilling effect on future purchases of the L-3 Stock Fund by Plan participants, whose trust in their employer is inevitably eroded by this malfeasance.  Such an effect constitutes a net harm to the Plan.

**B.  L-3 Should Have Halted All New Purchases**

170.    Defendants, as members of the Committee, were empowered by the Plan's governing documents and ERISA to close the L-3 Stock Fund to new purchases, or to issue new investment guidelines or otherwise prevent Plan participants from purchasing the L-3 Stock Fund at artificially inflated prices, at least until the stock price corrected to an uninflated value.  And as long as the Committee simultaneously prohibited sales of L-3 Stock Fund shares, such an action would be perfectly permissible under the federal securities laws.

171.    Defendants could not have reasonably believed that restricting new purchases of the L-3 Stock Fund would likely do more harm than good to the Plan or Plan participants.    Simply preventing new purchases would not have constituted "insider trading" under the federal securities laws because restricting purchases at inflated prices would not constitute a transaction or convey any insider benefit.    The act of halting new purchases itself also would not constitute "inside" information.    Halting new purchases would also be unlikely to have a material impact on L-3's stock price, because the volume of purchases by the Plan was only a small percentage of the overall stock trading volume. But even if halting purchases did have a negative impact on the stock price, it would only be reducing the artificial inflation of the stock, which ultimately would benefit Plan participants by enabling them to avoid the harm of purchasing and holding shares at inflated prices.

172.    And by not halting purchases, Defendants caused the Plan participants to suffer serious and concrete financial harm because they overpaid for stock that was fraudulently inflated in price, when they had other available investment options.    No matter what happened to the stock price in the future, the Plan participants who purchased L-3 Stock Fund shares during the Class Period were damaged because they suffered unnecessary losses when the artificial inflation was corrected, and they missed out on profits they would have received from any stock price recovery at some point in the future.

173.    Defendants could have ended the continuing harm caused to the Plan and its participants from purchases of artificially inflated and imprudent stock during the Class Period.    In fact, halting purchases within the Plan until the stock price corrected was prudent, lawful and within the Committee's rights.    After apprising their co-fiduciaries of

their knowledge that L-3 stock was artificially inflated by fraud, and therefore imprudent, Defendants could have directed the Committee to close the L-3 Stock Fund until such time as the fraud concluded.

174.    Defendants should not have refrained from doing so simply because closing the L-3 Stock Fund, even temporarily, might have necessitated public disclosure of that fact.  While such disclosure would likely have caused some negative impact on the stock price, the stock was artificially inflated by fraud, so any such reduction would only be in the artificial inflation value.

175.    Moreover, as with the public-disclosure option, Defendants knew or should have known that full disclosure of the Company's fraud was inevitable—because of the ongoing regulatory scrutiny, the existence of whistleblowers, the requirements of the federal securities laws, and common sense—and that a price correction was, therefore, also inevitable.  Such a disclosure might have encouraged Defendants to go the rest of the way and make the full, truthful disclosure that would have ended the artificial inflation of L-3's stock altogether, which would be all to the good.  But until full disclosure did occur, the L-3 Stock Fund would remain an imprudent investment, and Plan participants buying its shares would be incurring harm.  Closing the L-3 Stock Fund would at least put an end to that ongoing harm.

176.    Put another way, the amount of the loss to the Plan that would occur from the disclosure that the L-3 Stock Fund had been temporarily frozen, given the size of the Plan's stock holdings relative to the overall market for L-3 stock and the significant degree to which L-3 stock was artificially inflated at the time, would still be smaller than the $30 million in artificially-inflated purchases that occurred over the course of the Class Period.

Any reasonable fiduciary would have recognized that fact and, therefore, also recognized that the greater harm to Plan participants would come from *not* acting.

177.     By failing to halt new purchases of the L-3 Stock Fund, Defendants also denied the Plan participants the opportunity to invest in the prudent alternative investment options under the Plan.  These investment options included various mutual funds which invested in the broad securities markets. These mutual funds performed well in 2014, and the Plan participants were damaged because their money went into artificially inflated stock that was poised to decline, rather than the alternative appreciating funds.

### C.  Defendants Should Have Directed a Portion of the Plan Into a Low-Cost Hedging Product

178.     As a last resort, Defendants could have their utilized their authority over the Plan or over the investment guidelines to which any third-party investment manager delegatee was beholden to invest a small but significant portion of the Plan's holdings into a low-cost hedging product.  Such products have been widely available to ESOPs for many years now.  They are not derivatives, and therefore their purchase need not be disclosed under the securities laws.  Their costs are relatively small, and are certainly far less than the losses the Plan inevitably experienced on L-3 stock when L-3's fraud came to light. These hedging products are designed to trade counter to L-3 stock so that, when the Plan did experience losses on L-3 stock as its fraud came to light, those losses would have been lessened by the hedging position.

179.     Such products can be funded through a variety of means, including using the Plan's liquid assets, the provision of cash by the Plan Sponsor, or by the Plan's securing third-party financing to purchase such a product.  Generally, in cases where the Plan's Sponsor is such a large corporation like L-3, the hedging product would be funded by way

of a cash contribution made by L-3 to the Plan itself which would then purchase the product, or L-3 would purchase the product for the Plan as beneficiary. L-3's 2013 net income was $751 million and its total assets exceeded $14 billion; L-3 possessed the financial resources to provide funding to the Plan to purchase a low-cost hedging product.

180.    Even if L-3, as the Plan's Sponsor, was not a viable option to provide cash to the Plan, the Plan itself could have provided the cash to pay for the product. Alternatively, Plan had the option of financing the purchase of the product. But, given the low cost of the product and the enormous risk of loss the Plan was facing due to the artificial inflation of the Company's stock price, the use of Plan funds for this end could not reasonably have been viewed as likely to cause more harm than good to the Plan or to its participants.

181.    ESOP hedging products are structured as irrevocable trusts that pool funds together from a group of financially healthy and diverse companies for a fixed period of time. Applicants are screened and vetted for the benefit and protection of other participating companies. (Despite its ongoing misconduct, however, L-3 still would have qualified for participation in one of these pools.) The trust is managed by an independent third party. During a fixed, agreed-upon time period, the pooled funds are invested safely and securely, typically in United States Treasury securities. At the conclusion of the fixed period, the trust restores losses caused by declines in the price of company stock.

182.    The benefits of ESOP hedging products far outweigh their risks. First, the cost is extremely low. Typical products offering this protection only require annual cash deposits of 1-2%. However, if the trust is not required to restore any losses to participating companies, refunds of over half of the amount of the annual contributions are typically

64

issued to participants. This can bring the cost of participation down to 0.10% per year. Second, should the participant's stock appreciate in value during the fixed period, the participant retains all of the benefit of that appreciation, and all of the benefit of any dividends paid.

183.    In addition, nothing in the governing L-3 Plan documents or in the ERISA statute would have required disclosure of this highly-circumscribed hedging effort to the public, regulators, or even to Plan participants. An ESOP hedging product could have been utilized by Defendants without fear of "spooking the market" (to the extent that would even be a rational fear given the likelihood of L-3's fraud coming to light). Nor would use of Plan or Plan Sponsor cash to participate in a pool of funds being typically invested in U.S. Treasuries have implicated the insider trading laws in any way; no Plan stock would need to be sold to finance this effort.

184.    Thus, once Defendants became aware of L-3's fraud and the artificial inflation of the Company's stock, they should have sought out a low-cost hedge product to soften the blow to Plan participants that would come when the fraud was finally revealed. At the very least, they should have undertaken a minimum of due diligence to investigate the existence of ESOP hedging products and other potential hedging strategies given the obvious concerns generated by the artificial inflation of L-3's stock.

185.    Had Defendants sought to hedge the Plan's L-3 stock holdings, they could have mitigated the damages caused to the Plan and Plan participants by L-3's fraud. But they did nothing, and Plan participants suffered catastrophic losses as a result of this inaction.

186.    In sum, Defendants breached their fiduciary obligations to Plan and its participants.  They allowed those to whom they owed duties that are the "highest known to the law" to purchase and hold L-3 stock at an artificially high price during the Class Period, knowing that damaging material information was not factored into the stock price or disclosed to the public.  Even though L-3's stock price may have eventually recovered its losses, Plan participants have still been injured because they were deprived of retirement money that otherwise would have rightfully been theirs from overpaying for the stock.  As factual discovery and expert analysis will show, if Defendants had engineered this disclosure earlier in the Class Period, L-3's stock price correction would have been milder, and the stock price's recovery would have been even swifter and stronger.  Additionally, Plan participants who simply held L-3 shares during the Class Period were injured as well, because they were prohibited from being able to invest in an alternative, prudent investment that would not have caused them the same losses during the Class Period.

187.    Plan participants suffered losses of millions upon millions of dollars from investments in the L-3 Stock Fund in their retirement accounts.  Defendants are directly responsible for the enormous harm that their breaches of duty caused.  Had Defendants properly discharged their fiduciary duties, the Plan and Plan participants would have avoided some or perhaps all of the losses that they suffered through their continued investment in the L-3 Stock Fund.

## VII.    CLASS ACTION ALLEGATIONS

188.    Plaintiff brings this action as a class action pursuant to Federal Rule of

Procedure 23(a), (b)(l) and/or (b)(2) on behalf of himself and the following class of persons

similarly situated (the "Class"):

> All individuals who participated in the Plan and whose
> individual accounts purchased and/or held the L-3 Stock
> Fund at any time between January 30, 2014, through July 31,
> 2014, inclusive.

189.    Excluded from the Class are Defendants, other officers and directors of the

Company, Defendants' legal representatives, heirs, successors or assigns and any entity in

which Defendants have or had a controlling interest.

190.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this

time and can only be ascertained through appropriate discovery, Plaintiff believes that there

are at least 62,969 members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by L-3 or the Plan and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily

used in securities class actions.

191.    Plaintiff's claims are typical of the claims of the members of the Class as

all members of the Class are similarly affected by Defendants' wrongful conduct in

violation of federal law complained of herein.

192.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among

the questions of law and fact common to the Class are:

a.      Whether Defendants owed a fiduciary duty to the Plan, to Plaintiff and to members of the Class;

b.      Whether Defendants breached fiduciary duties owed to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.      Whether Defendants violated ERISA; and

d.      The extent to which Class members have sustained damages and the proper measure of those damages.

193.    Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages or were negatively affected by Defendants' wrongful conduct in violation of ERISA as complained of herein.

194.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class actions and complex litigation, including actions involving ERISA plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

195.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

196.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants

have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

197.   Plaintiff also brings this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

## COUNT I
### Failure to Prudently and Loyally Manage the Plan's Assets

198.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

199.   At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

200.   Under ERISA, a fiduciary who exercises discretionary authority or control over management of a plan or disposition of a plan's assets is responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, a fiduciary is responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for the losses incurred as a result of such investments being imprudent.

201.   A fiduciary's duty of prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or

directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or to whom they delegate, or who are directed by the plans, including plan trustees, to do so.

202.    Defendants' duty of prudence also obligated them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

203.    Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, Defendants knew or should have known that the L-3 Stock Fund had become an imprudent investment for Plan participants' retirement savings because L-3 had engaged in fraud by making false and misleading material statements to the Plan participants and the public, and withholding material disclosure from the Plan participants and the public about the stock that had artificially inflated its value.

204.    Accordingly, Defendants should have taken appropriate responsive action by restricting transactions or new investments by the Plan in the L-3 Stock Fund or by effectuating disclosures that would have corrected the stock price and rendered the L-3 Stock Fund a prudent investment again.

205.    As such, between January 30, 2014 and July 31, 2014, Plan participants could not appreciate the true risks presented by investments in L-3's stock and, therefore, could not make informed decisions regarding their investments.

206.    Defendants were also obligated under ERISA to discharge their duties with respect to the Plan solely in the best interests of Plan participants and for the exclusive purpose of providing benefits to Plan participants.

207.    As part of this fiduciary duty of loyalty, Defendants were obligated to be truthful in all communications with Plan participants.

208.    When Defendants knew that L-3's stock price had become artificially inflated by fraud, and that Plan participants who bought and held shares of the L-3 Stock Fund were therefore being victimized by this fraud, Defendants' duty of loyalty compelled them to be truthful with Plan participants and not to allow them to continue to be victimized by the Company's fraud.  Defendants' passive failure to prevent an ongoing fraud being perpetrated against Plan participants thus breached their fiduciary duty of loyalty.

209.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiff as class

representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.      Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from their breaches of its fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.      An Order that Defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the Company Stock Fund in proportion to the accounts' losses attributable to the decline in the price of its common stock and/or the value of investment in alternative options under the Plan.

H.      Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

I.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

K.    An Order for equitable restitution and other appropriate equitable monetary relief against Defendants; and

L.    Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

DATED:  January 27, 2017

By: _/s/ Samuel E. Bonderoff_
    Samuel E. Bonderoff

Jacob H. Zamansky
Edward H. Glenn, Jr.
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
_samuel@zamansky.com_

ATTORNEYS FOR PLAINTIFF