UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
JOHN PRICE, individually and on behalf of all
others similarly situated,

                                Plaintiff,

                    -against-

MICHAEL STRIANESE and RALPH
D'AMBROSIO,

                               Defendants.
-------------------------------------------------------------- X

17-CV-652 (VEC)

MEMORANDUM
OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

       Plaintiff John Price, a participant in L-3 Communications Corporation's ("L-3") retirement savings plan ("Plan"), alleges that Defendants Michael Strianese and Ralph D'Ambrosio, fiduciaries to the Plan and L-3's CEO and CFO, respectively, breached their fiduciary duty of prudence owed to Plan participants pursuant to Section 502 of Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. This purported class action follows closely on the heels of a securities class action arising out of the same underlying accounting misconduct, which L-3 disclosed on July 31, 2014, *see Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038 (S.D.N.Y. filed on August 1, 2014), and the Complaint relies almost entirely on the same alleged facts.[1] In this case, Plaintiff claims that Defendants breached the fiduciary duty owed to Plan participants who were invested in L-3 stock from January 30, 2014, through July 31, 2014 ("Class Period"). According to Plaintiff, Defendants knew or should have known that L-3's share price was artificially inflated due to the accounting fraud and the material misstatements that resulted from the fraud, but they failed to take any action to

---

[1] In the securities fraud action, the Court dismissed the Second Consolidated Amended Complaint against Strianese and D'Ambrosio but not against L-3, and the case subsequently settled.

protect Plan participants from harm resulting from the imprudent investment in L-3 stock. Defendants move to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and for the following reasons, the Court grants Defendants' motion.

**BACKGROUND**

The Plan is a defined contribution benefit plan sponsored by L-3. Compl. ¶ 8 (Dkt. 2). Both Strianese and D'Ambrosio were members of L-3's Benefit Plan Committee ("Committee"), which is designated as the Plan's fiduciary, and thus both Strianese and D'Ambrosio are Plan fiduciaries pursuant to ERISA. *Id.* ¶ 1. Plan participants may choose to direct their investments into several funds, one of which is the L-3 Stock Fund, an employee stock ownership plan ("ESOP") that invests primarily in L-3 stock. *Id.* ¶ 36. According to the 2014 Summary Plan Document issued to Plan participants, the Committee is responsible for selecting investments under the Plan. *Id.* ¶ 37. During the Class Period, the Plan had substantial holdings of the L-3 Stock Fund; as of December 31, 2013, one month before the Class Period began, the L-3 Stock Fund was the largest single investment held by the Plan at $909 million. *Id.* ¶ 39.

Plaintiff alleges that Defendants knew or should have known that the L-3 Stock Fund had become an imprudent investment during the Class Period. *Id.* ¶¶ 10, 151. As the executives responsible for L-3's financial disclosures, Defendants allegedly knew or should have known that the Company's financial results were materially misstated in light of an accounting fraud within L-3's Aerospace Systems segment related to the "C-12 Contract," a contract pursuant to which Aerospace Systems serviced U.S. Army C-12 airplanes. *See id.* ¶¶ 10, 151, 154. According to Plaintiff, Defendants, as fiduciaries to the Plan, should have closed the L-3 Stock Fund to new purchases, made a corrective disclosure earlier than July 31, 2014, or invested some of the Plan's funds in a low-cost hedging product to counteract losses resulting from investments in L-3 stock. *Id.* ¶¶ 11, 12, 19, 40, 153. Plan participants who purchased or held onto L-3 stock

2

at inflated prices during the Class Period and forewent other prudent investment alternatives were allegedly harmed by Defendants' breach of their fiduciary duty to the Plan. *Id.* ¶ 144. In addition, Plan participants who had been invested in the L-3 Stock Fund were allegedly harmed by Defendants' breach when L-3's stock price dropped after L-3 disclosed the accounting misconduct on July 31, 2014. *Id.* ¶¶ 144, 152.

Apart from the ERISA specific allegations, the Complaint copies verbatim numerous paragraphs from the Second Consolidated Amended Complaint filed in the related securities fraud class action. *See Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038 (S.D.N.Y. filed on August 1, 2014), Dkt. 33. Because the Court recounted the alleged facts in significant detail in its decision on the motion to dismiss in the securities fraud case, the Court refers readers to that opinion. *See Patel v. L-3 Commc'ns Holdings Inc.*, Nos. 14-CV-6038, 14-CV-6182, 14-CV-6939 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016).

## DISCUSSION

### I. Legal Standard

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although all factual allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. But, "[t]hreadbare recitals

3

of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Id.*

II.     **The Complaint Fails to Allege Plausibly that Defendants Knew or Should Have Known that the L-3 Stock Fund Was An Imprudent Investment During the Putative Class Period**

ERISA requires fiduciaries to "act in a prudent manner 'under the circumstances then prevailing.'" *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (quoting 29 U.S.C. § 1104(a)(1)(B)). Defendants argue that Plaintiff has not adequately alleged that Defendants knew or should have known that L-3's stock price was artificially inflated and was, therefore, an imprudent investment. Defs. Mem. 11-14.[2] Defendants rely heavily on the Court's scienter analysis in *Patel*, the related securities case, in which the Court held that the plaintiffs had failed to allege, in accordance with the heightened pleading standard applicable to securities fraud cases, that Strianese and D'Ambrosio knew or should have known of the accounting fraud at the time the alleged misstatements were made. *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *9-12. In a nutshell, the Second Consolidated Amended Complaint in *Patel* did not allege facts giving rise to a strong inference that information regarding the fraudulent accounting associated with the C-12 Contract was communicated to Strianese or D'Ambrosio prior to L-3's disclosure in July 2014. *Id.* at *9-10, 12. Price fares no better than Patel. Even under the more generous Rule 12(b)(6) standard applicable here, the Complaint does not adequately allege that Strianese or D'Ambrosio knew or should have known that the L-3 share price was artificially inflated because of the C-12 Contract accounting fraud and that L-3 stock was, therefore, an

---

[2]     The Court cites to Defendants' Memorandum of Law (Dkt. 15) as "Defs. Mem."; Plaintiff's Memorandum of Law in Opposition (Dkt. 17) as "Pl. Opp."; and Defendants' Reply Memorandum of Law (Dkt. 18) as "Defs. Reply."

imprudent investment. The Court, however, in addition to relying on its thorough analysis in the related securities case, addresses the facts newly alleged in this case to which Plaintiff cites in support of his argument that he has plausibly alleged Defendants' knowledge.

To shore up the facts from *Patel*, Plaintiff relies, somewhat inexplicably, on the SEC's cease and desist order, entered on January 11, 2017, which imposed a $1.6 million fine on L-3 for a "books and records" violation. *See* Compl. ¶¶ 146-49; Pl. Opp. 6. According to the SEC, in November 2013, a whistleblower submitted an ethics complaint about "certain aspects" of the C-12 Contract. Supp. Decl. of David Elbaum, Ex. V ("SEC Order") ¶ 12 (Dkt. 19-1).[3] The content of the whistleblower's allegation is not reflected in the Complaint or in the SEC's cease and desist order. L-3's internal ethics department commenced an investigation into the whistleblower's allegations. *Id.* At that time, executives at L-3's Army Sustainment Division ("ASD")[4] knew that the C-12 Contract was projected to lose money for the fiscal year and that ASD had performed work pursuant to the C-12 Contract that had not been billed to the U.S. Army. *Id.* ¶ 5.

Plaintiff argues that Defendants learned of the November 2013 ethics complaint at an Audit Committee meeting on December 12, 2013, at which the Ethics Officer updated the Audit Committee concerning ethical concerns that had been reported to L-3. Pl. Opp. 5-6 (citing Compl. ¶¶ 89, 147). Plaintiff contends that because Defendants learned of the November 2013 ethics complaint in December 2013, they knew as of that time about the accounting misconduct

---

[3] Because Plaintiff incorporates the SEC order by reference into his Complaint, the Court may rely on it in deciding Defendants' motion to dismiss. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (holding that a complaint is "deemed to include . . . any statements or documents incorporated in it by reference" (citation omitted)).

[4] ASD is a subdivision of Aerospace Systems. Aerospace Systems is one of L-3's four business segments and is responsible for 36% of L-3's profits. Compl. ¶¶ 42, 96.

associated with the C-12 Contract. *Id.* at 5. But without any allegations regarding the content of the November 2013 ethics complaint, beyond that it related to "certain aspects" of the C-12 Contract, the Court cannot plausibly infer that Defendants knew or should have known about the accounting fraud. It is particularly implausible to infer that Defendants knew about the accounting fraud associated with the C-12 Contract based on the November 2013 ethics complaint because, according to the SEC, the fraud did not occur until December 2013. The SEC's cease and desist order (on which Plaintiff relies) states that ASD executives knew as of mid-2013 that ASD was at risk of not making its annual operating plan because of projected losses arising out of the C-12 Contract. SEC Order ¶ 5. But it was not until December 2013 that ASD employees generated approximately sixty-nine invoices to cover performed, but un-invoiced, work on the C-12 Contract. *Id.* ¶ 8. Although those invoices were not delivered to the Army, ASD improperly recognized $17.9 million in revenue associated with the invoices so that ASD could meet its financial targets. *Id.* Accordingly, while Plaintiff may have plausibly alleged, consistent with the SEC order, that Defendants knew ASD was losing money on the C-12 Contract, the Court cannot infer from the allegations in the Complaint that Defendants knew or should have known that there was a fraud associated with the C-12 Contract, let alone that L-3's share price was artificially inflated and, therefore, an imprudent investment.

Plaintiff has also failed to allege plausibly that Defendants learned of the sixty-nine invoices at the December 2013 Audit Committee meeting. According to the SEC, in December 2013, an additional "specific report" was raised to L-3's internal ethics department when the sixty-nine invoices were created, and the ethics department investigated the report. SEC Order ¶ 13. The SEC's order provides, however, that the C-12 Contract "invoice issue was *not* timely raised to the Audit Committee of L3's Board of Directors" in advance of the Audit Committee meeting in December 12, 2013, because "the ethics investigators failed to identify the improper

6

revenue recognition issue . . . and misinterpreted statements made to them by witnesses." *Id.* ¶ 14 (emphasis added). Plaintiff strategically failed to include in the Complaint the SEC's finding that the pertinent information was not conveyed to the Audit Committee in December 2013; that finding precludes a plausible inference that the attendees of the December 2013 Audit Committee meeting, including Defendants, learned at that time of improper revenue recognition (or other accounting irregularities) associated with the C-12 Contract.

In addition to the allegations in the Second Consolidated Amended Complaint in *Patel*, Plaintiff alleges a new fact regarding a purported meeting that occurred between a whistleblower and L-3 senior executives in spring 2014. Just as the *Patel* plaintiffs had done, Plaintiff alleges, based on second hand information from another L-3 employee, that a whistleblower went to New York in March or April 2014 to meet with unspecified L-3 "senior executives." Compl. ¶ 130. Plaintiff adds that "[u]pon information and belief, Defendants were among those made aware of what the Whistleblower had to say." *Id.* That allegation is vague and conclusory. Assuming that the second hand report that the meeting occurred is accurate, because the Complaint does not allege *anything* about what the whistleblower reported, the fact that Plaintiff believes Defendants were made aware of the whistleblower's report does not allow the Court to infer that Defendants knew or should have known that there were accounting irregularities associated with the C-12 contract or that L-3's share price was artificially inflated and therefore an imprudent investment. In other words, even accepting that the meeting occurred and that Defendants learned what the whistleblower had to say during the meeting, what the Defendants allegedly learned remains a mystery because there is no allegation addressing what the whistleblower said.[5] Moreover, the

---

[5] In order to state a claim, Plaintiff has to allege facts that allow the Court to conclude that Defendants knew (or they should have known) not merely that there was a "problem" with the C-12 Contract but that L-3's financial statements were materially misstated due to the "problem" with the C-12 Contract.

7

Complaint is silent relative to when the Defendants allegedly learned whatever the whistleblower had to say about the C-12 Contract—consistent with the Complaint, they could have learned of the whistleblower's information on the eve of commencing L-3's internal investigation in June 2014, which led to the public disclosure on July 31, 2014.

Plaintiffs argue that this case is like *Jander v. Int'l Bus. Machines Corp.*, 205 F. Supp. 3d 538 (S.D.N.Y. 2016), an ERISA case in which the district court held that plaintiffs had plausibly alleged that the defendants knew or should have known that IBM's stock price was artificially inflated, even though it also held that the plaintiffs had not adequately alleged scienter in the related securities action. Pl. Opp. 4-5. The *Jander* ERISA case is distinguishable. In *Jander*, IBM had announced that it was taking a $2.4 billion write-down in connection with the sale of its microelectronics business. *Jander*, 205 F. Supp. 3d at 540. Plaintiffs alleged that Generally Accepted Accounting Principles required IBM to have recorded an earlier impairment of its microelectronic assets and that IBM's stock price had therefore been overvalued. *Id.* The complaint plausibly alleged that the individual defendants, IBM's CFO, General Counsel, and senior-most accounting officer, knew that IBM's stock price was artificially inflated because they had "firsthand knowledge": IBM had been struggling to sell its microelectronic business for several years because the business was losing money and its assets were worth little, and the individual defendants were involved in the microelectronic business's financial reporting and efforts to sell the business. Amended Complaint ¶¶ 10, 40-42, 80-82, *Jander v. Int'l Bus. Machines Corp.*, No. 15-CV-3781 (WHP) (S.D.N.Y. filed August 13, 2015), Dkt. 12; *see also Jander*, 205 F. Supp. 3d at 542 (noting that plaintiffs alleged that defendants knew that IBM's stock price had been artificially inflated because they knew that the "Microelectronics business was hemorrhaging money and that IBM could not sell it without having to pay another company $1.5 billion to take the failing business off its hands." (citing Amended Complaint)).

8

In contrast to *Jander*, in which the alleged misstatement related to a $2.4 billion write down associated with the sale of an entire business segment, in this case, the alleged material misstatement arises out of improper recognition of $17.9 million in revenue associated with a single contract in a subdivision of one of L-3's four business segments. A company's senior most executives, such as the defendants in both cases, plausibly have knowledge of the former but not necessarily the latter; a significant write down associated with the sale of a business segment necessarily requires the involvement of the company's senior most executives, whereas the revenue recognition associated with a single contract typically does not. Moreover, although the write down arising out of the C-12 Contract ultimately grew to $69 million for 2011 through the second quarter of 2014, even that larger number is less significant for a company the size of L-3, which reported $4.3 billion in operating income for that same period, Compl. ¶ 76; *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *16, than the $2.4 billion write down at issue in *Jander*, 205 F. Supp. 3d at 540. The bigger the write down, the more likely the underlying undisclosed information would have reached the senior most executives. For these reasons, it was plausible to infer in *Jander* that the individual defendants knew that the stock price was artificially inflated, whereas it is not plausible in this case.

In short, Plaintiff has not plausibly alleged that Defendants knew or should have known that the L-3 Stock Fund had become an imprudent investment during the Class Period because L-3's stock price was artificially inflated as a result of accounting improprieties associated with the C-12 Contract. Plaintiff's Complaint is accordingly dismissed.

**III.   The Complaint Fails to Plead a Duty of Prudence Claim**

Even if Plaintiff had plausibly alleged that Defendants knew or should have known that L-3 stock had become an imprudent investment, Plaintiff has nevertheless failed to allege an ERISA duty of prudence claim. To allege that an ESOP fiduciary breached his or her fiduciary

9

duty of prudence, "a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2472 (2014); *Amgen Inc. v. Harris*, 136 S. Ct. 758, 759-60 (2016) (reiterating *Fifth Third's* holding and emphasizing that plaintiffs must allege that "a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good.'" (quoting *Fifth Third*, 134 S. Ct. at 2463)). This is a highly exacting standard that is incredibly difficult to satisfy. *Jander*, 205 F. Supp. 3d at 545. Indeed, the vast majority of ERISA duty of prudence claims brought against ESOPs since *Fifth Third* have foundered on the pleading requirements. *See, e.g.*, *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 67-68 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1067 (2017); *Loeza v. John Does 1-10*, 659 F. App'x 44, 46 (2d Cir. 2016) (summary order); *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016); *Jander*, 205 F. Supp. 3d at 545-46. Although Plaintiff argues that the lower courts are not applying *Fifth Third* and *Amgen* correctly, he cited no cases that support his position that the correct standard is not as stated above.[6]

Plaintiff contends that there were three alternative courses of actions that Defendants could have taken that would have satisfied their duty of prudence: (1) halt new purchases of L-3

---

[6] To support his argument that the appropriate standard is not as onerous as lower courts are saying, Plaintiff cited at oral argument three "stock drop" ESOP cases that were decided after *Fifth Third* but before *Amgen* and that survived a motion to dismiss. *See* September 7, 2017 Oral Argument Tr. ("Tr.") 22:15-22. None of those cases is persuasive. *See Murray v. Invacare Corp.*, 125 F. Supp. 3d 660 (N.D. Ohio 2015) (relies on Ninth Circuit's decision in *Amgen*, which was reversed by the Supreme Court); *Ramirez v. J.C. Penney Corp. Inc.*, No. 6:14-CV-601 (MHS) (KNM), 2015 WL 5766498, at *4 (E.D. Tex. Sept. 29, 2015) (concluding that disclosing a fraud is the only action consistent with the securities laws and therefore "the harm caused by that action is irrelevant," without considering the timing of disclosure); *In re Suntrust Banks, Inc. ERISA Litig.*, No. 1:08-CV-03384 (RWS), 2016 WL 4377131, at *1 (N.D. Ga. Aug. 17, 2016) (Plaintiffs' alleged alternative actions were consistent with *Fifth Third*, but the opinion in no way addresses the issue; instead, the opinion resolves motions for partial summary judgment, to certify a class, and to strike, without touching on the issues in *Fifth Third*.). The Court acknowledges Plaintiff's point made during oral argument that many post-*Amgen* cases are still pending, Tr. 23:1-7, but, to date, courts have decided these cases consistently and have required, *inter alia*, plaintiffs to identify an alternative course of conduct that a prudent fiduciary could not have concluded would do more harm than good.

stock by the L-3 Stock Fund, Compl. ¶¶ 11, 13, 153, 170-77; (2) issue an earlier "corrective disclosure" "to cure the fraud and make L-3's stock a prudent investment again," *id.* ¶¶ 12, 15-18, 153, 155-69; or (3) invest in a low-cost "hedging product to offset future losses," *id.* ¶¶ 19, 153, 178-85. These alternative courses of action do not satisfy *Fifth Third* because Plaintiff has failed to plead facts plausibly showing that any of these alternatives was legally viable or that Defendants could not have concluded that they would do more harm than good.

### A. Halting the Plan's Investment in L-3 Stock

Plaintiff's allegation that Defendants could have closed the L-3 Stock Fund to new purchases or otherwise prevented Plan participants from purchasing L-3 stock until the stock price corrected to a non-inflated value does not satisfy *Fifth Third*. This alternative has been consistently proposed post *Fifth Third* and has been consistently rejected in light of *Fifth Third's* requirement that the plaintiff allege that a prudent fiduciary could not have concluded that the alternative action would do more harm than good. For example, in *Rinehart*, where the ESOP invested in company stock three months before Lehman Brothers' collapse, the Second Circuit affirmed the district court, holding that "a prudent fiduciary could have concluded that . . . simply holding [Lehman stock] without purchasing more would do more harm than good" and that "[s]uch an alternative action in the summer of 2008 could have had dire consequences." 817 F.3d at 68 (internal quotation marks and citation omitted); *Loeza*, 659 F. App'x at 46 (affirming district court's holding that the complaint failed to allege that a prudent fiduciary could not have concluded that freezing purchases in company stock would cause more harm than good).[7] These dire consequences include sending the stock into a significant price decline and weakening

---

[7] *See also Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 864 (6th Cir. 2017); *Whitley*, 838 F.3d at 529; *Martone v. Whole Foods Mkt., Inc*, No. 1:15-CV-877 (RP), 2016 WL 5416543, at *8 (W.D. Tex. Sept. 28, 2016); *Jander*, 205 F. Supp. 3d at 545-46.

11

investor confidence in the company—particularly if the freeze is not accompanied by a disclosure explaining the reason for the freeze.[8] *Harris v. Amgen, Inc.*, 788 F.3d 916, 925-26 (9th Cir. 2015) (Kozinski, J., dissenting) ("[W]ithdrawal of the fund as an investment option is the worst type of disclosure: It signals that something may be deeply wrong inside a company but doesn't provide the market with information to gauge the stock's true value."), *cert. granted, judgment rev'd,* 136 S. Ct. 758 (2016).[9] For these reasons, Plaintiff's allegation that Defendants could have satisfied their duty of prudence by halting investment in L-3 stock fails.

**B. Issuing a Corrective Disclosure**

The second alternative advanced by Plaintiff—making an earlier public corrective disclosure—is also not adequately pled pursuant to *Fifth Third*. Just as courts have consistently rejected halting investments in company stock as a viable alternative under *Fifth Third*, so too have they rejected earlier public disclosure. "Since *Fifth Third*, courts have consistently held that complaints alleging [corrective disclosures] fail to meet the second prong of *Fifth Third*." *Graham v. Fearon*, No. 1:16 CV 2366 (PAG), 2017 WL 1113358, at *4 (N.D. Ohio Mar. 24, 2017).

Plaintiff argues that Defendants would have fulfilled their duty of prudence owed to Plan participants by disclosing the C-12 Contract accounting improprieties earlier because "[i]f they had made truthful disclosure 'at the beginning of the Class Period . . . virtually *all* of the artificial

---

[8]   ERISA requires plan administrators to notify participants in advance if plan fiduciaries halt new stock fund purchases, and federal securities laws would require the company to disclose that information to the public. *In re JPMorgan Chase & Co. Erisa Litig.*, No. 12 CIV. 04027 (GBD), 2016 WL 110521, at *3 (S.D.N.Y. Jan. 8, 2016) (citing 29 U.S.C. § 1021 (i)(1) and 17 C.F.R. § 243.100(a)(1)), *aff'd sub nom. Loeza v. John Does 1-10*, 659 F. App'x 44 (2d Cir. 2016).

[9]   S*ee also Fifth Third*, 134 S. Ct. at 2473 ("[L]ower courts faced with such claims should . . . consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment— . . . would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.").

inflation of L-3's stock price that occurred could have been avoided.'" Pl. Opp. 16 (quoting Compl. ¶ 159). Courts have repeatedly rejected this theory as not "particular to the facts" of any case. *In re JPMorgan Chase & Co. Erisa Litig.*, 2016 WL 110521, at *4 (rejecting the theory of earlier disclosure on the basis that the longer a fraud continues, the more painful correction will be because "[t]hese assertions are not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence).[10] "Instead, courts recognize that, given the negative impact of disclosure, a prudent fiduciary 'could very easily conclude that such [an] action[ ] *would* do more harm than good.'" *Graham*, 2017 WL 1113358, at *5 (quoting *Whitley*, 838 F.3d at 529); *Rinehart*, 817 F.3d at 68 (plaintiff did not plausibly plead facts showing that a prudent fiduciary during the class period would not have viewed the disclosure of nonpublic information as more likely to harm plan participants than to help them). This is particularly true if, as here, the disclosure would have been made before the company had an opportunity to investigate the issue that would have been disclosed.

The Court can, however, imagine a scenario in which a proposed corrective disclosure could potentially survive *Fifth Third's* standard. It would require, however, particularized allegations from which an ESOP fiduciary would have to conclude that earlier disclosure of the "bad fact" would necessarily cause less damage than a later disclosure. What is critical—and what is missing from this Complaint—are facts from which a court could conclude that a prudent fiduciary in the same circumstances could not have viewed disclosure as more likely to harm the fund than to help it. For example, if an ESOP fiduciary were aware that the company is a Ponzi scheme that is built on sand and virtually worthless, it seems likely that the fiduciary could not conclude that it would cause more harm than good to disclose as soon as possible. In that

---

[10] *See also Jander*, 205 F. Supp. 3d at 546; *Graham*, 2017 WL 1113358, at *5.

hypothetical, the fiduciary knows that the stock the employees are buying in the ESOP is worthless. If the fiduciary were to delay disclosure, plan participants would continue to invest in worthless stock, thereby unequivocally increasing their losses. That would be a clear and obvious breach of fiduciary duty. In that scenario, upon disclosure, the drop in the stock price would be the same—it would essentially drop to $0—regardless of whether the company discloses sooner or later because the entire company is a fraud. But, the harm to plan participants would be *less* if the company discloses the Ponzi scheme sooner because participants would have been less heavily invested.

Unlike the hypothetical Ponzi scheme, here a prudent fiduciary could have concluded that early disclosure would do more harm than good. Plaintiff attempts to satisfy *Fifth Third* by arguing that Defendants should have disclosed earlier because public disclosure was inevitable in light of the whistleblower report and government investigations.[11] *See* Pl. Opp. 2, 15-18. But the alleged facts show only that the C-12 Contract accounting improprieties were known by some employees at the subdivision and segment level, and when more senior executives learned of the issue, L-3 conducted an internal investigation and promptly disclosed the issue while continuing to conduct an internal review. On those facts, a prudent fiduciary in the same circumstances could easily have viewed earlier disclosure as more likely to harm the fund than to help it.[12] The hypothetical posited above is a narrow one, but it defeats Plaintiff's argument that *First Third* and *Amgen,* as interpreted by lower courts to date, will cause ERISA duty of

---

[11] The Complaint does not clearly allege when the government investigations began or when L-3 learned of them. L-3's Form 10-Q for the period ending June 27, 2014 (filed on October 10, 2014) disclosed that L-3 had received subpoenas for documents and other materials from the SEC and DOJ, but it does not disclose when. Compl. ¶ 66. In any event, there are no allegations that L-3 knew it was being investigated prior to receipt of a subpoena some time during the second quarter of 2014.

[12] Conventional wisdom is that the market punishes uncertainty. It is for that reason that a prudent fiduciary could easily conclude that disclosure before the company has all its ducks in a row would do more harm than good.

prudence claims for ESOPs to go "extinct," *see* Pl. Opp. 18. Moreover, that only an extremely narrow category of ESOP fiduciary duty claims based on failure to disclose nonpublic information may survive is not particularly troubling. An ESOP fiduciary duty claim based on the failure to disclose adverse information targets—albeit from a different angle—generally the same conduct as a securities claim for material misstatements, but "'ERISA and the securities laws ultimately have differing objectives pursued under entirely separate statutory schemes' such that alleged securities law violations do not necessarily trigger a valid ERISA claim." *Jander*, 205 F. Supp. 3d at 546 (quoting *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 768-69 (S.D.N.Y. 2015), *aff'd sub nom. Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1067 (2017)).

### C. Investing in a Hedging Product

The third alternative proposed by Plaintiff is an investment in a "low-cost hedging product that would behave in a countercyclical fashion vis-à-vis L-3 stock." Compl. ¶ 19. Plaintiff does not identify this mysterious hedging product by name and provides only a vague description.[13] The alleged hedging product is not a derivative but employs a proprietary hedging formula to trade counter to L-3 stock so that losses resulting from a decline in L-3's stock price are lessened. *Id.* ¶¶ 19, 178. According to the Complaint, the product is structured as an irrevocable trust that pools funds from a group of financially healthy and diverse companies to invest in United States Treasury securities or similar securities for a fixed period of time. *Id.* ¶ 181. At the conclusion of the fixed period, the trust restores losses caused by declines in the price of company stock. *Id.* Applicants for the product are screened and vetted for the benefit

---

[13] At oral argument, Plaintiff identified "StockShield" as an example of the low cost-hedging product described in his Complaint. Tr. 40:10-21. The Court does not consider the specific qualities of that product because it was not alleged in the Complaint.

and protection of other participating companies, and L-3 would have allegedly qualified. *Id.* In essence, the alleged hedging product appears to be an insurance product.

This third alternative is also not adequately pled pursuant to *Fifth Third* because the description of the hedging product is simply too vague for the Court to conclude that it reflects a viable option. Based on Plaintiff's allegations, it is unclear whether the purchase of such a product would qualify as the purchase of a security that might implicate insider trading laws. Plaintiff proposes that Defendants should have purchased this hedging product as soon as they learned about the C-12 Contract accounting fraud. Given that the nature of the hedging product is unclear and that its purpose is to provide a payout if L-3's stock price declines, the Court cannot assess whether the purchase of the hedging product, based on undisclosed adverse information, might violate the securities laws. Plaintiff alleges that purchasing the product would not implicate insider trading laws, Compl. ¶ 183, but that is a legal conclusion that the Court is not required to accept. *See Iqbal*, 556 U.S. at 678. Plaintiff also alleges that this hedging scheme would not have violated insider trading laws because no stock from the L-3 Stock Fund would need to have been sold to finance the hedging scheme. Compl. ¶ 183. That could be true, but the securities laws broadly prohibit deceptive schemes "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5; *see also In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185 (KPE), 2015 WL 1781727, at *14 (S.D. Tex. Mar. 4, 2015) ("[I]t would have violated the insider trading laws to have hedged against an anticipated drop in [the company's] stock price based on insider information."), *motion to certify appeal granted*, No. 10-MD-2185 (KPE), 2015 WL 926199 (S.D. Tex. Mar. 4, 2015), *and rev'd on other grounds and remanded sub nom. Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016).

Moreover, the Court finds it entirely implausible that the offeror of any hedging product that operates as the Complaint describes would not require a purchaser to disclose known

adverse information or to represent that it is unaware of any material, adverse information that has not been disclosed. It would be an odd insurance provider that would agree to provide insurance to a party seeking to insure itself against the risk of its share price going down when that party definitively knows that the share price will go down in the near future. Accordingly, if Defendants failed to disclose the adverse information regarding the accounting fraud to the hedging product provider, they could have potentially been liable for fraud. In sum, Plaintiff has not plausibly alleged that purchasing the hedging product would have been legal. *See Graham*, 2017 WL 1113358, at *6 ("Plaintiffs have not plausibly alleged that purchasing an unidentified hedging product would have been consistent with the securities laws[.]").[14]

Even if the purchase of the hedging product would be entirely lawful, the Complaint's description of the product is too vague to determine whether a prudent fiduciary could not have viewed the hedging product as more likely to harm the fund than to help it. Plaintiff alleges that the product is low cost at annual cash deposits of 1-2% (presumably of the value of the investment being hedged). Compl. ¶ 182. But even just 1% of a $909 million fund is almost $10 million, and the value of an insurance policy can only be determined relative to the scope of insurance coverage provided. Plaintiff does not allege whether the hedging product he is proposing covers all losses or only those up to or above a certain threshold. Nor does he allege whether purchasing the product is accompanied by any risks beyond the not-insignificant cost of the product. Depending on the answers to those questions, a prudent fiduciary could easily have concluded that purchasing the hedging product was likely to cause more harm to the fund than to help it, most obviously because the risk and cost of the hedging product outweighed its potential

---

[14] The Supreme Court in *Fifth Third* stated that the alternative being considered must be consistent with the securities laws. 134 S.Ct. at 2472. This Court does not read that passage in *Fifth Third* to suggest that a course of action that is lawful under the securities laws but is unlawful under other laws should be treated as a viable option.

17

benefit. *See Graham*, 2017 WL 1113358, at *6 ("Plaintiffs have not plausibly alleged that . . . a prudent fiduciary in Defendants' circumstances would not have viewed [purchasing the unidentified hedging product] as more likely to harm the fund than to help it" because plaintiffs provided no "more than assumptions and speculation.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, and Plaintiff's Complaint is DISMISSED. If Plaintiff wishes to move for leave to amend, he must do so no later than **October 26, 2017**. The Clerk of Court is respectfully directed to terminate the open motion at docket entry 14.

**SO ORDERED.**

**Date: October 4, 2017**                                       **VALERIE CAPRONI**
      **New York, New York**                        **United States District Judge**